## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
FEDERAL ENERGY )
REGULATORY COMMISSION )
888 First Street, N.E. )
Washington, D.C. 20426, )
)     Case No._____
Petitioner, )
)
v. )
)
CITY POWER MARKETING, LLC )     **JURY TRIAL REQUESTED**
and K. STEPHEN TSINGAS, )
)
Respondents. )
_____)

### PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY COMMISSION'S JULY 2, 2015 ORDER ASSESSING CIVIL PENALTIES AGAINST CITY POWER MARKETING, LLC AND K. STEPHEN TSINGAS

Petitioner Federal Energy Regulatory Commission ("FERC" or "Commission"), pursuant to section 31(d)(3) of the Federal Power Act ("FPA"), 16 U.S.C. § 823b(d)(3) (2012), petitions this Court for an order affirming the Commission's July 2, 2015 Order Assessing Civil Penalties ("Order Assessing Civil Penalties" or "Order") against City Power Marketing, LLC ("City Power") and K. Stephen Tsingas (together, "Respondents").  The Order Assessing Civil Penalties, *City Power Marketing, LLC and K. Stephen Tsingas*, 152 FERC ¶ 61,012 (2015), is attached as Exhibit 1 and incorporated by reference in this petition.

### SUMMARY OF THE ACTION

1.     This is an action seeking affirmance of a Commission order assessing civil penalties (a) against City Power and Tsingas for violating section 222 of the FPA, 16 U.S.C. § 824v(a) (2012), and the Commission's rule prohibiting manipulation, 18 C.F.R. § 1c.2 (2015)

("Anti-Manipulation Rule"), through a scheme to defraud participants in the regional wholesale electricity market operated by PJM Interconnection, L.L.C. ("PJM") of more than $2 million, and (b) against City Power for violating the Commission's rule requiring truthfulness in communications, 18 C.F.R. § 35.41(b) (2015), by making false and misleading statements and omitting material information to conceal the existence of highly relevant instant messages ("IMs").

2.     After a thorough investigation by the Commission's Office of Enforcement ("Enforcement"), the Commission initiated a show cause proceeding, based on a voluminous administrative record filed with the agency.  Following an adversarial proceeding in which Enforcement and Respondents were opposing parties before the agency, on July 2, 2015, the Commission issued a 125-page Order Assessing Civil Penalties, attached as Exhibit 1.

3.     The trades at issue in this case were placed by City Power and Tsingas in July 2010 in the 13-state wholesale electricity market operated by PJM.  In the Order, the Commission determined that through "artificial, high-volume" trades, Respondents violated section 222 of the Federal Power Act and the Commission's Anti-Manipulation Rule by "deceiv[ing] PJM . . . by creating the false impression that City Power was trading to arbitrage price differentials when, in fact, it was engaging in trades solely to collect [certain market] payments to the detriment of other market participants."  Order at PP 6, 8.

4.     The Commission found that City Power's and Tsingas' manipulative trades deprived other market participants, including utilities serving retail customers, of more than $2 million.  Two utilities lost more than $200,000 each as a result of Respondents' unlawful scheme.  Order at P 161.

5.        Because it has been granted the right to make trades at market prices, rather than at prices set by a tariff, City Power is required to comply with the Commission's Market Behavior Rule, including the requirement in 18 C.F.R. § 35.41(b) to be truthful and candid in communications with the Commission.  In addition to finding that Respondents engaged in market manipulation, the Commission separately found that City Power violated section 35.41(b) by "engag[ing] in a series of misrepresentations, false statements, and material omissions" in an "attempt to cover up [their] intent in placing the [trades]." *Id.* P 191.  The purpose of Respondents' false and misleading communications to Enforcement was to "willfully obstruct[] the investigation by concealing relevant IM communications." *Id.* P 252.  The coverup eventually failed when a former City Power employee produced the IMs in response to a subpoena, *id.* P 57.

6.        In light of City Power's and Tsingas' violations of section 222 of the Federal Power Act and sections 1c.2 and 35.41(b) of the Commission's regulations, the Commission (a) ordered City Power and Tsingas to disgorge $1,278,358 in unjust profits (after deducting expenses) and (b) imposed a $1 million civil penalty on Tsingas and a $14 million civil penalty on City Power and Tsingas, jointly and severally.  Order at PP 234-260, 263-274.

7.        Although they had the option under the FPA to have the matter litigated in a trial-type proceeding before an Administrative Law Judge, City Power and Tsingas each elected the procedures of FPA section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) (2012), under which the Commission may assess a civil penalty that, if unpaid in 60 days, can be enforced by a federal district court.  Neither City Power nor Tsingas has made the payments set forth in the Order within the 60-day period.

8.      The Commission therefore respectfully brings this action for an order from this Court (1) affirming the Order Assessing Civil Penalties with a corresponding judgment and (2) requiring City Power and Tsingas to make the payments specified in the Order.

## PARTIES

### A.          Petitioner

9.      FERC is an administrative agency of the United States, organized and existing pursuant to the Federal Power Act, 16 U.S.C. § 791a *et seq.*  Under the Act, the Commission is charged (among other things) with regulating wholesale electricity markets.  Under 16 U.S.C. § 825f (2012), the Commission has the authority to investigate potential violations of the Act and of the agency's regulations implementing the Act.  As authorized by the Act, 16 U.S.C. § 825f(b) (2012), the Commission relies on its Office of Enforcement to investigate potential violations.

### B.          Respondents

10.     City Power is an energy trading firm with offices at 515 E Las Olas Blvd # 1360, Fort Lauderdale, FL 33301.  In 2005, City Power was authorized by the Commission to make market-based rate sales for resale of electric energy, Order at P 12, and continued to have market-based rate authority during 2010 and 2011.

11.     Tsingas is a U.S. citizen residing at 1400 W. Lake Drive, Fort Lauderdale, FL 33316.  Tsingas founded City Power in 2005 and has controlled it continuously since then.  Tsingas has always been the majority owner of City Power, and since at least 2012 has been its sole owner.  Order at PP 12, 14.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to section 31(d)(3)(B) of the Federal Power Act, 16 U.S.C. § 823b(d)(3)(B).

13.     Following the Commission's March 6, 2015 issuance of an Order to Show Cause to City Power and Tsingas under FPA section 31(d)(1), 16 U.S.C. § 823b(d)(1), City Power and Tsingas each elected the procedures of FPA section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), under which the Commission may assess a civil penalty that, if unpaid in 60 days, can be enforced by a federal district court.

14.     Pursuant to City Power's and Tsingas' elections, and after considering the evidence and arguments submitted by Enforcement and Respondents, the Commission issued its Order Assessing Civil Penalties.  Because neither City Power nor Tsingas paid their respective penalties within 60 days, the statute directs the Commission to file an enforcement action to affirm the assessment order.  FPA section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) ("If the civil penalty has not been paid within 60 calendar days after the assessment order has been made under subparagraph (A), the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty.").  Under that same provision, this Court "shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art . . ." the Commission's assessment of the civil penalty.  Respondents having failed to make payment within the 60 day period set forth in the FPA, the Commission now respectfully brings this action to enforce the terms of the Order without modification.

15.     Venue properly lies within the District of Columbia pursuant to FPA section 317, 16 U.S.C. § 825p (2012), which provides that "[a]ny suit or action to enforce any liability or duty created by . . . this Act, or any rule, regulation, or order thereunder may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the

defendant is an inhabitant . . . ."   Here, several of the acts or transactions constituting the

violations occurred in this District:  (a) City Power's and Tsingas' trading scheme in July 2010

defrauded PJM, whose coverage area includes the District of Columbia, (b) the trading scheme

harmed market participants throughout PJM's territory, including those in the District of

Columbia, (c) Tsingas gave false and misleading answers and omitted material information in his

testimony at Commission offices in Washington, D.C. in October 2010, in an effort to prevent

Enforcement staff from learning about critical evidence, (d) for the same unlawful purpose, City

Power (through Tsingas) sent false and misleading statements and omitted material information in

sworn submissions to Commission staff in Washington, D.C. in December 2010 and November

2011, and (e) Respondents' false and misleading statements and material omissions are the basis

for one of the two claims in this proceeding (for violation of 18 C.F.R. § 35.41(b)).

### THE COMMISSION'S ANTI-MANIPULATION AUTHORITY

16.     In the wake of manipulative schemes by Enron and others in the western U.S.

electricity markets, Congress, through the Energy Policy Act of 2005, amended the FPA to give

the Commission broad authority to prohibit energy market manipulation.  In relevant part, FPA

section 222, 16 U.S.C. § 824v(a), makes it "unlawful for any entity . . . directly or indirectly, to

use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or

deceptive device or contrivance . . . in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of electric ratepayers."

17.     The Commission implemented this statutory authorization in 2006 by

promulgating the Anti-Manipulation Rule, 18 C.F.R. § 1c.2.  As explained by the Commission in

its Order promulgating the regulation, section 1c.2 prohibits an entity from (1) (a) using a

fraudulent device, scheme, or artifice, or (b) making a material misrepresentation or a material

omission as to which there is a duty to speak under a Commission-filed tariff, Commission order,

rule, or regulation, or (c) engaging in any act, practice, or course of business that operates or

would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in

connection with the purchase or sale of electricity subject to the jurisdiction of the Commission.

*Prohibition of Energy Market Manipulation*, Order No. 670, FERC Stats. & Regs. ¶ 31,202, at

P 49 (2006) ("Order No. 670").  For purposes of this rule, "the Commission defines fraud

generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing,

obstructing, or defeating a well-functioning market.  Fraud is a question of fact that is to be

determined by all the circumstances of a case."  *Id.* P 50.

18.     The Energy Policy Act of 2005 also provided the Commission with increased

civil penalty authority:  as amended by that Act, section 316A of the FPA, 16 U.S.C. § 825o-1,

authorizes the Commission to assess civil penalties against violators up to $1 million per

violation, per day.  In assessing penalties, the Commission must consider "the seriousness of the

violation and the effort of such person to remedy the violation in a timely manner."  FPA section

316A, 16 U.S.C. § 825o-1(b).

19.     In 2008, the Commission adopted a policy that it would consider five factors to

determine the amount of the civil penalty for violations:  (1) seriousness of the offense;

(2) commitment to compliance; (3) self-reporting; (4) cooperation; and (5) reliance on prior

Enforcement guidance.  *Enforcement of Statutes, Regulations & Orders*, 123 FERC ¶ 61,156, at

PP 54-71 (2008) ("Revised Policy Statement on Enforcement").  The Commission applied these

factors in determining appropriate penalties for City Power and Tsingas.  Order at PP 225-229,

234-260, 263-268.  In addition, the Commission has long required respondents to disgorge unjust

profits, and it followed that practice in this case.  *Id.* PP 271-274.

## PROCEDURAL BACKGROUND

20.     After receiving complaints that certain market participants were reserving

extraordinarily large volumes of transmission on its wholesale grid, PJM investigated trading

conducted by City Power and certain other virtual traders in the summer of 2010.  Order at

PP 27-30.  After looking into the trades, PJM submitted a written referral to the Commission.

PJM told the Commission that City Power (and a handful of other market participants)

"intentionally submitted large volumes of transactions [in PJM] for no purpose other than to

illegitimately collect larger allocations" of certain payments from PJM.  Order at P 29.

21.     In August 2010, Enforcement opened an investigation of trading by City Power

and certain other market participants.  On August 25, 2010, the Commission issued an Order of

Non-Public, Formal Investigation.  *PJM Up-To Congestion Transactions*, 132 FERC ¶ 61,169

(2010).

22.     Over the course of its investigation, Enforcement obtained more than 1,460

pages of sworn testimony from City Power traders and other traders, more than 1,000 pages of

IMs written by Tsingas and other City Power employees, narrative and document responses from

City Power and Tsingas to 70 written data requests, responses from 13 third parties to data

requests, complete trading data and other relevant materials from PJM, and calculations by City

Power about the economics of the trades at issue.  All of these materials were submitted to the

Commission (and provided to Respondents) for use in the 2015 show cause proceeding.  City

Power and Tsingas did not dispute that they placed the trades at issue at the times and in the

volumes shown in trading records.

8

23.     After considering the factual record, including City Power's and Tsingas'
submissions, Enforcement preliminarily concluded that Respondents had violated section 1c.2 of
the Commission's rules by making trades in July 2010 that falsely appeared to be arbitrage trades
when in fact Respondents placed the trades simply to divert certain payments from other market
participants.  Enforcement also preliminarily concluded that City Power violated section
35.41(b) of the Commission's rules, 18 C.F.R. § 35.41(b), by making false and misleading
statements and material omissions to conceal the existence of instant messages written by
Tsingas and another trader.

24.     In a 24-page letter to Respondents' counsel dated September 19, 2013,
Enforcement told City Power and Tsingas that it had preliminarily determined that Respondents
had violated Rules 1c and 35.41(b); explained the evidence on which Enforcement relied; and
invited Respondents to respond.  Respondents submitted a 45-page response on November 4,
2013.

25.     In September 2014, Enforcement notified Respondents (pursuant to section
1b.19 of the Commission's regulations, 18 C.F.R. § 1b.19 (2015)) that it intended to recommend
that the Commission initiate a public proceeding against Respondents, and invited them to
respond.  Respondents submitted a 39-page response on October 27, 2014 ("1b.19 Response").

26.     After considering Respondents' 1b.19 Response, Enforcement prepared and
submitted a Staff Report recommending that the Commission (a) find that Respondents violated
section 1c of the Commission's rules, (b) find that City Power violated section 35.41(b) of the
Commission's rules, (c) order disgorgement of unjust profits with interest, and (d) impose civil
penalties.  Enforcement transmitted the Staff Report to the Commission, along with
Respondents' 1b.19 Response.

27.      On March 6, 2015, the Commission issued an Order to Show Cause to Respondents (attached hereto as Exhibit 2), directing them to show cause why the recommended penalties and disgorgement set forth in the Staff Report should not be imposed.  Respondents had the opportunity to submit any factual or legal materials of their choice in response to the Order to Show Cause, with no page limit.  Among other things, Respondents could submit a declaration from Tsingas rebutting the assertions in the Staff Report – if they believed his 886 pages of sworn testimony were insufficient – but they elected not to do so.

28.      When (as here) the Commission initiates an adversarial show cause proceeding, the Enforcement staff who investigated a case do not advise the Commission during its deliberations in the proceeding.  The Commission's Separation of Functions regulation, Rule 2202, 18 C.F.R. § 385.2202 (2015), prohibits such investigative staff from participating in findings, conclusions, or decisions except as a witness or counsel in public proceedings.

29.      On April 6, 2015, Respondents filed a 188-page response to the Order to Show Cause, along with a 22-page expert affidavit.  On April 7, 2015, Respondents notified the Commission of their decision under section 31 of the FPA to waive their opportunity for a trial-type proceeding before an Administrative Law Judge pursuant to 5 U.S.C. § 554 in favor of a penalty assessment by the Commission with review by a federal district court.

30.      On May 5, 2015, Enforcement Staff filed a Reply.  Order at 37.  The filings by both Enforcement and Respondents are available on the Commission's web site at http://elibrary.ferc.gov/idmws/docket_search.asp, under Docket No. IN15-5.

31.      On July 2, 2015, the Commission issued its Order Assessing Civil Penalties (Exhibit 1).  In the Order, the Commission found that through their trading in PJM in July 2010, City Power and Tsingas violated section 222 of the Federal Power Act and the Commission's

Anti-Manipulation Rule, 18 C.F.R. § 1c; found that City Power violated 18 C.F.R. § 35.41(b) through a series of false and misleading communications with Enforcement; ordered City Power and Tsingas to disgorge $1,278,358 in unjust profits; and imposed a $1 million civil penalty on Tsingas and a $14 million civil penalty on City Power and Tsingas, jointly and severally.  Order at PP 234-260, 263-274.

32.     The Commission's Order discusses the relevant facts in detail, considers and evaluates the arguments made by Respondents in their lengthy response, cites to pertinent record evidence, and applies the Commission's own rules and precedents to Respondents' conduct. Among other things, the Commission quotes and relies on many contemporaneous IMs in which Tsingas and his City Power partner discussed the trades at issue in this proceeding.  Order at PP 2-33, 43-57, 92-170, 178-192, 216-223.  In the next section, we summarize the Commission's principal findings in the Order Assessing Civil Penalties.  (As discussed above, this Petition incorporates the entire Order by reference.)

## SUMMARY OF COMMISSION FINDINGS

### The PJM Market and the UTC Product

33.     PJM is an independent, nonprofit, Regional Transmission Organization, which operates a wholesale electricity market in a 13-state region extending from North Carolina to New Jersey to Illinois, including the District of Columbia.  Order at P 15.  PJM is regulated by the Commission.  At the Commission's direction, PJM has a watchdog unit, called a Market Monitor, that, among other responsibilities, seeks to detect (and to alert the Commission to) improper conduct by market participants.

34.     PJM uses market-based systems to provide electricity at the lowest possible cost consistent with maintaining the reliable operation of the grid.  To send appropriate price signals,

"[e]lectricity prices in PJM vary based on the specific location, or node, within the market."

Order at P 15.  Since prices vary by location, market prices for energy at particular nodes are

called "Locational Marginal Prices," or LMPs.  *Id.*

35.     PJM operates both a day-ahead market and a real-time market.  In the day-ahead

market, market participants engage in transactions involving energy that will flow through power

lines the following day.  In the real-time market, market participants engage in transactions

involving energy that will flow through power lines the same day.  Order at PP 2, 16.  PJM

provides the trading platforms and, with its Market Monitor, oversees the trading activity.

36.     Each LMP settles at a unique price in both the day-ahead and real-time markets.

LMPs at particular nodes may change between the day-ahead market and the real-time market.

Since prices at individual nodes may go up or down, the difference (or "spread") between LMPs

at two nodes may likewise change between the day-ahead and real-time markets.

37.     The Commission has authorized PJM and other organized markets to allow not

only firms that buy and sell physical power (such as utilities and generators) but also "virtual"

market participants (*i.e.*, purely financial traders, or arbitrageurs), to participate in wholesale

electric markets.  Order at P 17.  Virtual transactions are settled financially, rather than through

actual transmission of power.  *Id.*  P 17.  Although "virtual products carry no obligation to buy or

sell physical power, they serve a direct role in day-ahead price formation as reflected in day-ahead

LMPs."  *Id.*  In particular, virtual products can  "(1) be the price setting marginal factor in

determining day-ahead LMPs; (2) affect day-ahead dispatch; and (3) affect other market

participant positions."  *Id.*

38.     PJM allows market participants to place a type of transaction called an "Up To

Congestion" ("UTC") trade, which is "a type of spread trade that allows market participants to

arbitrage the difference between day-ahead and real-time [prices] at two different locations."
Order at P 2.  That is, in UTC transactions, virtual traders try to profit by accurately predicting
whether the difference (or spread) between the prices at two pricing nodes will widen or narrow
between the day-ahead and real-time markets.  Arbitrage trading with UTCs "is difficult,
requiring fundamentals-based, sophisticated analyses regarding weather, generator and
transmission outages, and historical data."  *Id.* P 43 (citing Tsingas testimony).  The reason for
allowing virtual traders such as City Power to make UTC trades is to "permit [them] to arbitrage
the market to encourage [price] convergence" between these two markets.  Order at P 115.  The
procedures for conducting UTC trades during this period are described in detail in the Order at
PP 18-22.

39.       In the summer of 2010, placing a UTC trade was a two-step process.  Order at
P 22.  First, the trader would use PJM's Open Access Same Time Information System (OASIS) to
reserve some amount of transmission for the intended transaction.  *Id.*  (Free transmission was
often an option in placing virtual trades, and reserving free transmission enabled traders to
minimize transaction costs.  *Id.* PP 156-157.)  Second, if the trader successfully reserved
transmission, the trader would enter the transaction specifics – such as time of day, "source" and
"sink" nodes (*i.e.*, the pricing points), and trading volume – into a different PJM system.

40.       If the trader's bid cleared, the trade could result in either spread gains or spread
losses, depending on whether the price difference between the two points in the real-time market
was higher or lower than it had been in the day-ahead market.  That is, arbitrage profits or losses
depended on whether the trader had accurately predicted changes in prices between the day-ahead
and real-time markets.

41.     From 2006 through June 2010, City Power and Tsingas used UTCs exclusively to do arbitrage trading.  Order at PP 43, 181.  Although at all times they understood that the legitimate purpose of UTC trading is arbitrage, during July 2010 City Power and Tsingas placed large volumes of UTC transactions aimed not at arbitrage but at creating the false appearance of arbitrage to collect millions of dollars in payments from PJM that would otherwise have gone to other market participants.  *Id*. PP 4-7, 45-52, 92-160.

### Marginal Loss Surplus and Its Allocation

42.     One component of locational prices in PJM is the cost of the electricity that is lost to heat as the energy moves across transmission lines.  This is called "line loss."  The greater the demand on the electric grid, the greater the amount of electricity is lost as heat on transmission lines.  Order at P 24.  For that reason, line losses are particularly high on hot summer days when air conditioning use leads to exceptionally high levels of demand for electricity.

43.     To ensure that purchasers pay the true cost of transmitting electricity to a particular location, the Commission requires that the line loss component of LMPs reflect the marginal, rather than the average, cost of line losses.  Order at P 24.  Because "marginal costs of line losses are greater than average costs, PJM receives more payments [from purchasers of power] than necessary to compensate [generators] for actual line losses, resulting in a surplus revenue."  *Id.*  This additional revenue is called the "marginal loss surplus."

44.     The Commission directed PJM to develop a method for disbursing the marginal loss surplus.  In September 2009, the Commission approved PJM's proposal to distribute this surplus by a marginal loss surplus allocation ("MLSA"), in which market participants would be paid MLSA pro rata based on the volume of paid transmission reserved in connection with their transactions.  Order at P 25.  Although free transmission was often an option in placing virtual

trades, only paid transmission qualified to receive MLSA.  As discussed below, City Power

voluntarily increased its transaction costs by paying for transmission to qualify to receive MLSA

in the manipulative trades at issue here.

### City Power's History of UTC Arbitrage Trades From 2006 Through June 2010

45.     The Commission found that, as of July 2010, City Power and Tsingas had many

years of experience with energy trading in general and with UTC trading in particular.  Order at

PP 12-14, 43-44.  Respondents "understood the arbitrage-based purpose of UTC trading in PJM,"

*id.* P 181, that is, they knew that the legitimate purpose of UTC trading by virtual traders is to try

to profit by arbitraging price differences between the day-ahead and real-time markets.  *Id.*

PP 180-181, 186.  And they knew from experience that legitimate arbitrage trading using UTCs is

challenging, research-intensive, work.  *Id.* P 181.

46.     City Power and Tsingas did arbitrage trading in PJM from 2006 through June

2010, primarily "trad[ing] UTCs between points where [they] anticipated the spread would widen

between the day-ahead and real-time markets."  *Id*.  City Power and Tsingas called these the

firm's "regular" trades.  *Id*. P 44.

### City Power and Tsingas Begin Placing Manipulative UTC Trades in July 2010

47.     The Commission found that in July 2010, while continuing to place arbitrage

trades, City Power and Tsingas also began placing a very different type of UTC trade, in

extremely large volumes, "aimed solely at collecting MLSA," which they called "losses" trades.

Order at P 44.  In these transactions, instead of trying to make arbitrage trades based on expert

predictions about likely price changes, City Power and Tsingas looked for trades with minimal, or

no, price changes, *id.* PP 44, 98, as a vehicle to divert MLSA from other market participants.

48.     City Power began placing this new type of trade after observing another trader reserving unusually large volumes of transmission during June 2010.  Order at P 46.  On July 3, 2010, Tsingas (using the IM name "traderyoda") wrote the following series of IMs to his City Power partner:

> traderyoda (10:55:35 AM): wonder what points they're doing
> traderyoda (10:55:44 AM): or is it the rope-a-dope
> traderyoda (10:55:57 AM): that may be the trick
> traderyoda (10:56:13 AM): do both sides to collect
> traderyoda (10:56:19 AM):  EUREKA
> traderyoda (10:56:33 AM):  those bastards

His partner wrote back:

> jurco831 (10:57:55 AM): nice
> jurco831 (10:58:05 AM): load up
> jurco831 (10:58:11 AM): net flat
> jurco831 (10:58:14 AM): collect

*Id.* P 93.

49.     "[Do[ing] both sides to collect" meant placing round trip trades (both A-to-B and B-to-A) that would cancel each other out as arbitrage trades, but nevertheless enable a trader "to collect" MLSA.  *Id.* P 94.  Tsingas' partner grasped the point immediately, recognizing that City Power could "collect" MLSA by placing large volumes ("load up") of round trip trades that would be "net flat."  *Id.* PP 93-94.

**City Power's First Type of Manipulative Trades:  A-to-B / B-to-A Round Trips**

50.     Having realized that "net flat" round trip trades could be a vehicle for collecting MLSA, Tsingas wrote to his partner:  "we'll try it for a few days and see the payout."  Order at P 98.  City Power placed its first round trip trade on July 3, 2010, resulting, as expected, in zero net spreads but nevertheless generating profits because of MLSA payments greater than

16

transaction costs.  The Commission found that having done this successful experiment, City

Power placed round trip trades for 18 days during July 2010, ending on July 24.  *Id.*  The

Commission concluded that "Respondents' round-trip trades were wash trades, which the

Commission has long recognized as fraudulent conduct."  *Id.* P 61.  The Commission determined

that City Power collected $734,212 in MLSA payments for these wash trades; after $278,482 in

transaction costs, City Power netted $455,730 in profits.  *Id.* P 48.

### City Power's Second Type of Manipulative Transactions: Trades Between Two Points ("SOUTHIMP" and "SOUTHEXP") That Had the Same Prices and Therefore Zero Spreads

51.     The Commission further found that City Power also placed a second type of UTC

trades aimed, not at arbitraging spread changes, but at collecting MLSA:  trades between the

SOUTHIMP and SOUTHEXP pricing nodes.  Order at PP 49-50.

52.     City Power and Tsingas began regularly placing trades between these two points

on July 5, 2010, after Tsingas realized (and told his partner in an IM) that the spread between

SOUTHIMP and SOUTHEXP "settl[ed] at $0 all the time" in both the real-time and day-ahead

markets.  Order at P 130.  Although placing UTC trades between points with the same prices

made no sense as arbitrage, and although Tsingas' partner pointed out that it would be "nuts" to

collect MLSA on zero-spread trades, SOUTHIMP-SOUTHEXP trades provided a pretext for City

Power and Tsingas to collect MLSA on large transaction volumes.  *Id.* PP 137-38.

53.     After realizing that SOUTHIMP-SOUTHEXP was a good candidate for

collecting MLSA on zero (or minimal) spreads, Tsingas told his partner, "we'll ride it out for a

few days," and "once I see that southimp-southexp works, that's all I'll do . . . until market

monitoring yells at us."  *Id.* P 132.

17

54.     City Power and Tsingas placed SOUTHIMP-SOUTHEXP trades on eight days between July 5 and July 14, 2010.  Order at P 136.  As Tsingas had seen when he began placing these trades, spreads between SOUTHIMP and SOUTHEXP were zero in both the day-ahead and real-time markets during this period.  *Id.*  Nonetheless, City Power and Tsingas continued placing the trades, in large volumes, as a vehicle to collect MLSA that would otherwise go to other market participants.

55.     The Commission found that Tsingas stopped placing SOUTHIMP-SOUTHEXP trades not because spreads were zero – which Tsingas knew from the first day he placed the trades – but in response to concerns expressed by his City Power partner, who told him on July 14 that he felt "really funny about the southimp-southexp," and that "this sure could be great ammo for [the market monitor]."  Order at PP 4, 50, 147.

**City Power's Third Type of Manipulative Transaction:
To Conceal Their Purpose, Respondents Place Uneconomic Trades Between Two
Points ("NCMPAIMP" and "NCMPAEXP") With Very Small, But Non-Zero, Spreads**

56.     The Commission found that, in light of his partner's expression of discomfort about their SOUTHIMP-SOUTHEXP trades, Tsingas replaced those transactions with large-volume trades between two other points:  NCMPAIMP and NCMPAEXP.  Order at PP 147-148.  These trades accomplished the same purpose as the SOUTHIMP-SOUTHEXP trades – collecting MLSA through trades with minimal spreads – but in a less obvious way, because NCMPAIMP-NCMPAEXP usually had small, non-zero spreads, both positive and negative.  *Id.* PP 147-154.

57.     The Commission analyzed both Tsingas' own statements (in his IMs to his partner) and the patterns and volumes of City Power's trades in concluding that Respondents placed the NCMPAIMP-NCMPAEXP trades to collect MLSA, not to profit from spread changes.  Order at PP 145-159.  For example, the Commission documented that the timing of City Power's

trades at NCMPAIMP-NCMPAEXP, as well as Tsingas' IMs about them, showed that they were

a replacement for the SOUTHIMP-SOUTHEXP trades.  *Id.* at PP 147-151.  The Commission also

observed that City Power opted to pay for transmission for its July 2010 NCMPA trades, thereby

voluntarily increasing its transaction costs, solely to be eligible for MLSA payments.  *Id.* P 152.

The Commission noted that City Power and Tsingas placed very large volumes of NCMPAIMP-

NCMPAEXP trades in July 2010, but did so in a series of smaller trades as part of what Tsingas

described as a "stay below the radar plan."  *Id.* PP 153-54.  In addition, the trades were

uneconomic as spread trades:  City Power lost more than $460,000 on its July 2010 NCMPAIMP-

NCMPAEXP transactions as spread trades after paying for transaction costs, but collected more

than $1.1 million in MLSA payments through the trades.  *Id.* PP 144, 157-159.

### The Commission Determined That City Power and Tsingas Acted With Scienter in Placing Each of These Three Types of Trades

58.     The Commission found that Respondents acted with scienter in placing all three

types of trades.  Order at PP 171-192.  As the Commission explained, "[s]cienter does not require

evidence that Respondents intended to break the law, but, rather, only that they intended to take

certain actions and knew the consequences of such actions."  *Id.* P 185.  Here, "Respondents

intended to trade UTCs in PJM in a way that eliminated or minimized risk from price spreads in

order to obtain transmission and profit solely from MLSA payments, and they understood the

consequences of trading on this basis – that they would be able to draw a greater share of MLSA

payments at the expense of other market participants.  It is this intent that matters for purposes of

establishing scienter."  *Id.*

59.     As to each of the three types of trades, the Commission evaluated the

traders' IMs, testimony, trading patterns, and the economics of their trades in determining

that City Power and Tsingas acted with scienter.  Order at PP 178-192.  Among other

things, the Commission noted that City Power and Tsingas referred to their round trip,

SOUTHIMP-SOUTHEXP, and NCMPAIMP-NCMPAEXP trades as "losses" trades (as

opposed to their "regular" trades) and that they knew that these trades conflicted with the

arbitrage-based purpose of UTC trading.  The Commission also relied on and quoted the

traders' contemporaneous IMs, including these:

- Tsingas told another City Power partner that he would do one of these types of trades "until market monitoring yells at us"

- Tsingas said that being paid MLSA for these trades felt "sleazy"

- Another City Power trader told Tsingas he felt "really funny" about one of these types of trades and that they would be "great ammo" for the Market Monitor

- Tsingas told his partner that the Market Monitor could have "ripped into me" about City Power's trades aimed at MLSA; and

- The City Power traders described their own (or similar trades by other firms) as a "scam," a way of "playing the rules," a "game," and as "high volume churn."

*Id.* PP 4, 44, 50, 170, 179, 182.

### The Commission Determined That It Has Jurisdiction Over City Power's and Tsingas' UTC Trading in PJM

60.     The Commission found that it had jurisdiction over Respondents' UTC trading

under the Federal Power Act.  Order at PP 193-203.  First, Respondents engaged in UTC

transactions and benefitted from MLSA payments under a Commission-approved tariff in a

Commission-regulated Regional Transmission Organization.  Second, the Commission has

authority over virtual transactions, including UTC trades, because they can affect market prices

for physical electricity.  *Id.* PP 200-201.  As the D.C. Circuit has held, the Commission has

"authority [under the Federal Power Act] to regulate the activity of traders who participate in

energy markets." *Id.* P 198 (quoting *Kourouma v. FERC*, 723 F.3d 274, 276 (D.C. Cir. 2012)).

Third, Respondents' UTC trades required them to reserve transmission, over which the

Commission has independent statutory authority.  *Id.* P 202.  Fourth, their trades were "in connection with" jurisdictional transactions, providing still another basis for Commission jurisdiction.  *Id.* P 203.

61.     The Commission also found that Respondents' UTC trades caused harm, both by diverting MLSA payments from other market participants and by affecting the availability of transmission reservations.  Order at PP 161-162.

### City Power's and Tsingas' Coverup of Instant Messages

62.     Because it has been granted market-based rate authority by the Commission, City Power is required to comply with the Commission's Market Behavior Rules, codified at 18 C.F.R. § 35.41.  One of these rules, governing communications by entities with market-based rate authority, requires firms such as City Power to "provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission . . . unless Seller exercises due diligence to prevent such occurrences."  18 C.F.R. § 35.41(b).

63.     During the summer of 2010, Tsingas and the City Power trader with whom he conducted UTC trades lived in different cities, and communicated with each other by instant message.  Their IMs, which Tsingas' City Power partner saved on his computer, included many discussions of the firm's UTC trading, Order at P 219, including the comments quoted above about Respondents' manipulative trades.

64.     As detailed in the Commission's Order, City Power (through Tsingas) repeatedly made false and misleading statements, and omitted material information, in communications with Commission staff about these IMs.  Specifically, during his testimony at Commission headquarters in October 2010, and in responses to data requests sent by Enforcement in December

21

2010 and November 2011, City Power (through Tsingas) made false and misleading statements
and omitted material information in an effort to conceal the existence of the IMs.  Order at
PP 53-57, 204-223.

65.     As the IMs themselves show, Tsingas learned on August 19, 2010 that his City
Power partner had kept a copy of the IMs the two had exchanged that summer, and was reminded
that the IMs included discussions of their UTC trades during that period.  Order at P 53.  Their IM
conversation that morning began as follows:

> jurco831 (8:21 :23 AM): hey
> jurco831 (8:21 :39 AM): did a little homework last night
> jurco831 (8:21 :49 AM): looking through my IM archives
> jurco831 (8:21 :57 AM): do you archive yours?
> traderyoda returned at 8:53:07 AM
> traderyoda (8:53:42 AM): unfortunately not
> traderyoda (8:55:30 AM): so, are we guilty or righteous?
> jurco831 (8:55:46 AM): 6/28 -first IM discussion
> jurco831 (8:55:58 AM): you literally wrote EUREKA!
> jurco831 (8:56:42 AM): we mention losses a lot

66.     Although Tsingas knew from that point on that his City Power partner had
retained a copy of their IMs, Tsingas nonetheless, speaking for and on behalf of City Power,
repeatedly and falsely denied knowing that the IMs had been saved and omitted any mention of
the fact that his partner had saved the IMs.  For example:

- Tsingas first falsely denied knowledge of the IMs in his testimony at Commission
  headquarters in October 2010.  When asked whether City Power kept records of IMs,
  he replied "I don't think we do."  When asked whether his colleagues "have set up
  their accounts to where it retains instant messages," Tsingas answered "I don't
  believe they do, you know, but I don't know 100 percent for a fact. […]  I don't
  remember if I checked or not.  My understanding is they don't. . . ."  Tsingas also

denied having made "any attempt to see if they have instant messages on their system." Order at P 54.

- In December 2010, Tsingas falsely certified, on behalf of City Power, that the firm's responses to data requests – including requests for "all communications" relating to UTC trading – were true, accurate and complete, even though the responses did not include the IMs that Tsingas knew his partner had archived. Order at P 55.

- In City Power's November 2011 response to staff's June 2011 Data Requests specifically asking about IMs, Tsingas stated on behalf of City Power that the company had "reviewed computer files to determine if instant messages had been saved or otherwise archived on company computers. They were not." Order at P 56. City Power also stated that "prior requests to [Tsingas' partner] to produce any responsive instant messages did not reveal any such instant messages." *Id.* City Power's response did not disclose that a City Power partner had kept a copy of the IMs, as Tsingas had known since August 19, 2010. Tsingas also swore (on behalf of City Power) that "upon receipt of Staff's document preservation directive [in August 2010], it was determined that City Power Marketing was not in possession of any responsive instant messages, and therefore no steps were required to prevent destruction of any such messages." *Id.*

67.     The Commission found that, since Tsingas knew when he made all of these statements that his City Power partner had retained copies of the IMs, his statements to Enforcement were false, misleading, and omitted material information. Order at 220-222. The Commission found that Respondents "intentionally impeded [Enforcement's] investigation," *id.* P 223, through "false and misleading statements and material omissions related to IMs

discussing the fraudulent trading scheme." *Id.* P 224.  The Commission found that Respondents

thereby "willfully obstructed the investigation by concealing relevant IM communications." *Id.*

P 252.

68.     City Power and Tsingas never produced the IMs, but Enforcement later learned

from Tsingas' (by then former) partner that he had in fact archived them.  Order at P 57.  As

discussed in the Order (and summarized above), the IMs include many discussions of City

Power's and Tsingas' UTC trades, and provide strong contemporaneous evidence of

Respondents' state of mind in placing their round trip, SOUTHIMP-SOUTHEXP, and

NCMPAIMP-NCMPAEXP trades in July 2010.

### Assessment of Penalty and Order of Disgorgement

69.     The Commission found that it had the authority to impose penalties on both City

Power and Tsingas because section 222 of the FPA prohibits fraud by "any entity," which

includes both corporations and individuals.  Order at P 265.

70.     The Order imposed a $14 million civil penalty on City Power and a $1 million

civil penalty on Tsingas, and ordered Respondents to disgorge $1,278,358, plus interest.  The

Commission also held City Power and Tsingas jointly and severally liable both for paying the

disgorgement amount and the civil penalty against City Power.  Order at PP 234-260, 263-268,

271-274.  The civil penalty was based on an evaluation of "all the facts and circumstances,"

including City Power's and Tsingas' manipulative trading and their coverup of relevant evidence.

*Id.* P 227.

71.     The Commission found these civil penalties to be statutorily authorized under the

FPA and appropriate under these circumstances.  Order at PP 224-268.  The Commission

determined that the civil penalty assessments against City Power and Tsingas were consistent with the Commission's policy statements.  *Id.* PP 234-259, 263-268.

## FIRST CLAIM FOR RELIEF

(Against City Power and Tsingas for Violating
FPA Section 222, 16 U.S.C. § 824v and 18 C.F.R. § 1c.2)

72.     The Commission repeats each and every allegation set forth in Paragraphs 1 through 71, as if set forth fully herein.

73.     Section 222(a) of the FPA makes it unlawful for any entity to use a deceptive or manipulative device in connection with the purchase or sale of electric energy or the transmission of electric energy subject to the Commission's jurisdiction.

74.     The Commission's Order No. 670 implemented this prohibition, adopting the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2015).  That rule, among other matters, prohibits any entity from:  (1) (a) using a fraudulent device, scheme or artifice, (b) making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule or regulation, or (c) engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase, sale or transmission of electric energy subject to the jurisdiction of the Commission.

75.     City Power and Tsingas used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission, in contravention of FPA section 222, 16 U.S.C. § 824v, and 18 C.F.R. § 1c.2. Specifically, City Power and Tsingas engaged in a fraudulent scheme to place artificial UTC

trades that falsely appeared to be legitimate trades as a way to divert MLSA payments from other market participants.

## SECOND CLAIM FOR RELIEF

### (Against City Power for Violating 18 C.F.R. § 35.41(b))

76.     The Commission repeats each and every allegation set forth in Paragraphs 1 through 71 and Paragraphs 73 through 75, as if set forth fully herein.

77.     Section 35.41(b) of the Commission's regulations requires that a Seller "provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission . . . unless Seller exercises due diligence to prevent such occurrences." At all relevant times, City Power was a Seller as that term is defined in 18 C.F.R. § 35.36(a)(1) (2015) because it had authorization from the Commission to make market-based sales for resale of electric energy.  Under section 316A of the Federal Power Act, 16 U.S.C. § 825o-1 (2012), the Commission has jurisdiction to assess civil penalties for violations of agency rules, including section 35.41(b).

78.     City Power (through Tsingas) made false and misleading statements to Commission staff, and omitted material information in communications with Commission staff, concerning the existence of relevant instant messages.  City Power did not exercise due diligence to prevent these false and misleading statements or to avoid these material omissions.  Although not necessary to establish a violation of section 35.41(b), City Power's violations were knowing and intentional.

**JURY DEMAND**

79.     The Commission respectfully submits that this Court can and should affirm the penalty assessments without modification following a review of the Commission's Order and the materials presented to the Commission during the penalty assessment process.

80.     Should the Court determine, however, that its review of the Order requires a trial on any issue, the Commission, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury on all issues triable as such.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

(A)     Enter an order and judgment affirming the Commission's assessment of a $14 million civil penalty against City Power and ordering City Power and Tsingas (jointly and severally) to pay that penalty.

(B)     Enter an order and judgment affirming the Commission's assessment of a $1 million civil penalty against Tsingas and ordering Tsingas to pay that penalty.

(C)     Enter an order and judgment affirming the Commission's order requiring City Power and Tsingas to disgorge $1,278,358 in unjust profits (plus interest) and ordering Respondents to pay those amounts in the manner specified in the Order.

(D)     Order such other and further relief as may be necessary and appropriate.

Respectfully submitted,

FEDERAL ENERGY
REGULATORY COMMISSION

LARRY PARKINSON
(DC Bar No. 387470)
Director
Office of Enforcement

27

LEE ANN WATSON
(DC Bar No. 985789)
Deputy Director
Office of Enforcement

DAVID APPLEBAUM
(DC Bar No. 474161)
Acting Director
Division of Investigations


/s/ Thomas P. Olson
THOMAS P. OLSON
(DC Bar No. 389220)
JAMES C. OWENS
(DC Bar No. 490140)
Attorneys
Division of Investigations
Office of Enforcement
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426
(202) 502-6278
Thomas.Olson@ferc.gov
Of Counsel

VINCENT H. COHEN, JR.
(DC Bar No. 471489)
Acting United States Attorney
District of Columbia

DANIEL F. VAN HORN
(DC Bar No. 924092)
Civil Chief

/s/
PETER PFAFFENROTH
(DC Bar No. 496637)
JENNIFER A. SHORT
(DC Bar No. 456884)
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC  20530
(202) 252-2529

Dated: September 1, 2015