UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL ENERGY REGULATORY COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 15-1428 (JDB)** |
| **CITY POWER MARKETING, LLC, and K. STEPHEN TSINGAS,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

City Power Marketing, LLC, an energy-trading firm founded by K. Stephen Tsingas, engaged in "virtual trading" in wholesale electricity markets. Virtual traders do not actually supply or receive electricity but instead stake out market positions that are effectively bets on how electricity prices will change over time. In other words, they engage in a kind of arbitrage. And their efforts are generally thought to improve the overall efficiency of energy markets.

According to the Federal Energy Regulatory Commission (FERC or Commission), however, in July 2010 City Power engaged in a series of manipulative virtual trades that hurt the market while generating more than $1 million of profit for City Power. In essence, City Power found a way to place trades that had no risk of earning or losing money on the basis of price changes but that nonetheless triggered a financial credit for City Power from the market operator. After a lengthy investigation, FERC concluded that these trades constituted a fraudulent scheme that violated the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2. FERC also concluded that by failing to reveal the existence of certain archived instant messages during the investigation, City Power had violated the Commission's Market Behavior Rule 3, 18 C.F.R. § 35.41(b), which requires truthful communications by parties subject to FERC's authority. FERC ordered City

Power to disgorge its profits and assessed penalties of $15 million on City Power and Tsingas. Disputing their liability, City Power and Tsingas did not pay. As provided for in the Federal Power Act, FERC therefore filed this action seeking an order affirming its penalty assessment.

City Power and Tsingas—whom the Court will collectively call "City Power," unless context indicates otherwise—have moved to dismiss, arguing that FERC's claims under both the Anti-Manipulation Rule and Market Behavior Rule 3 fail as a matter of law. City Power also argues that this case should be treated like a normal civil action subject to the Federal Rules of Civil Procedure, not a summary review of agency action. The Court largely agrees with City Power on this latter point, and will follow the normal course of district-court adjudication. But the Court disagrees that FERC's claims are unsound. Assuming the truth of FERC's allegations, as the Court must at this stage, FERC has stated plausible claims under both the Anti-Manipulation Rule and Market Behavior Rule 3. City Power's motion to dismiss will therefore be denied.

## BACKGROUND

### I. PJM's Wholesale Electricity Market

This case concerns allegedly illegal trading in the wholesale electricity market run by PJM Interconnection, LLC (PJM). PJM is the independent, nonprofit Regional Transmission Organization (RTO) that administers the electric grid in a 13-state region that extends from North Carolina to New Jersey to Illinois and includes the District of Columbia. As part of administering the grid, PJM operates a wholesale electricity auction of the sort recently described by the Supreme Court:

> These wholesale auctions serve to balance supply and demand on a continuous basis, producing prices for electricity that reflect its value at given locations and times throughout each day. Such a real-time mechanism is needed because, unlike most products, electricity cannot be stored effectively. Suppliers must generate—every day, hour, and minute— the exact amount of power necessary to meet demand from the utilities and

other "load-serving entities" (LSEs) that buy power at wholesale for resale to users.  To ensure that happens, wholesale market operators [such as PJM] obtain (1) orders from LSEs indicating how much electricity they need at various times and (2) bids from generators specifying how much electricity they can produce at those times and how much they will charge for it. Operators accept the generators' bids in order of cost (least expensive first) until they satisfy the LSEs' total demand.  The price of the last unit of electricity purchased is then paid to every supplier whose bid was accepted, regardless of its actual offer; and the total cost is split among the LSEs in proportion to how much energy they have ordered.  So, for example, suppose that at 9 a.m. on August 15 four plants serving Washington, D.C. can each produce some amount of electricity for, respectively, $10/unit, $20/unit, $30/unit, and $40/unit.  And suppose that LSEs' demand at that time and place is met after the operator accepts the three cheapest bids.  The first three generators would then all receive $30/unit.

FERC v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 768–69 (2016).  The clearing price at a particular location, or "node," on the PJM grid is called the "locational marginal price" (LMP).

PJM operates a so-called "dual settlement market," meaning that it runs two rounds of bidding for each operating day.  It first runs a "day-ahead market," which "allows market participants to secure prices for electric energy the day before the operating day and hedge against price fluctuations that can occur in real time.  One day ahead of actual dispatch, participants submit supply offers and demand bids for energy.  These bids are applied to each hour of the day and for each pricing location [i.e., node] on the system."  FERC, Energy Primer: A Handbook of Energy Market Basics 95 (Nov. 2015).  PJM takes all of the bids and offers, crunches the numbers, and determines what the clearing price—the "day-ahead LMP"—will be at each node.  Generators who offered to supply energy for less than the clearing price are committed to supply that energy and are paid the day-ahead LMP; buyers who bid to purchase energy for more than the clearing price are committed to their purchases and pay the day-ahead LMP.  Id.

The next day's actual supply of and demand for electricity, however, might be different from what the day-ahead market presumed.  A generation unit might unexpectedly fail, affecting supply, or the weather might be much different than predicted, affecting demand.  PJM therefore

3

also runs a "real-time market" designed "to meet energy needs within each hour of the current

day." Id. (The real-time market is also sometimes called the "spot market" or "balancing market.")

As the name suggests, offers and bids in this market are made in real time. "Real-time LMPs are

calculated at five-minute intervals based on actual grid operating conditions as calculated in PJM's

market systems." Id.

PJM's wholesale market is not restricted to those engaging in "physical transactions," i.e.,

those who will actually deliver or actually receive electricity. Traders who neither have nor want

actual megawatts can engage in "virtual transactions."

> A virtual transaction does not require generation to be dispatched or load to
> be served. Rather, it allows a market participant to arbitrage day-ahead
> versus real-time prices by either purchasing or selling a position in the day-
> ahead market, and then doing the opposite in an equal volume at the same
> location in the real-time market, thereby taking no physical position when
> the system is dispatched.

City Power Mktg., LLC, 152 FERC ¶ 61,012 at P 17 n.38 (2015) ("Penalty Assessment Order").

Suppose, for example, that a trader believes that the real-time LMP at a particular node will

be higher than the day-ahead LMP. (Perhaps the trader has reason to believe that the temperature

there will be higher than most forecasts predict, meaning increased air-conditioning use and hence

increased power consumption.) The trader makes a virtual bid in the day-ahead market to buy

100MW at $25/MW. If his bid clears, then to offset his purchase, he must also sell 100MW at the

same node in the real-time market. If his prediction turns out to have been correct, and the real-

time LMP rises to $30/MW, he makes a profit: he "bought" 100MW for $2500 in the day-ahead

market and "sold" it for $3000 in the real-time market. Likewise, a trader who correctly predicts

that the real-time LMP will be lower can conduct a mirror-image virtual transaction, promising in

the day-ahead market to supply 100MW in exchange for $3000, and then buying those 100MW in

the real-time market for only $2500. These sorts of arbitrage transactions—the first is called a

"decrement bid," the second an "increment offer"—are good not only for the traders but also for the market as a whole.  Virtual trading encourages price convergence between the day-ahead and real-time markets, and provides price discovery, market liquidity, and increased competition. Penalty Assessment Order at P 20 & n.48; <u>see also</u> PJM Interconnection, Virtual Transactions in the PJM Energy Markets 22–31 (Oct. 12, 2015) (explaining how virtual transactions help mitigate both buyer- and supplier-side market power).

This case centers on another, more complex transaction called an "Up-To Congestion" transaction (UTC).  Whereas the virtual transactions described in the preceding paragraph revolve around price changes at a single node, a UTC is concerned with the changing spread of prices between two nodes.  It works like this: The trader selects a "source" node and a "sink" node, specifies a number of megawatts, and bids a maximum amount by which the day-ahead LMP at the sink might exceed the day-ahead LMP at the source.  (The price difference correlates with the transmission congestion between the nodes, hence the name "Up-To Congestion.")  If the actual day-ahead price difference is less than the trader's bid, the UTC transaction clears, and the trader must pay the day-ahead price difference times the number of megawatts specified.  The trader will then <u>receive</u> the <u>real-time</u> price difference between the nodes (times the number of megawatts). Thus, if the price difference, or "spread," between the nodes is larger in real time, the UTC transaction is profitable.  <u>See</u> Penalty Assessment Order at PP 2 n.7, 18.

An example will illustrate.  A UTC trader might pick source A and sink B, specify 100MW, and say that the day-ahead price at B will be no more than $40/MW greater than at A.  After the day-ahead market clears, it turns out the price at B is $120/MW and the price at A is $90/MW. Because the difference is less than the trader specified, her transaction clears, and she must pay $3000: the actual difference ($30/MW) times the number of megawatts (100).  Luckily for the

trader, the price spread grows between the day-ahead and real-time markets.  In the real-time market, the price at B is up to \$130/MW; at A, down to \$85/MW.  Hence, the trader receives \$4500: the real-time price difference (\$45/MW) times the number of megawatts (100).  Taken as a whole (and ignoring certain transaction costs for the moment), the UTC turned a profit of \$1500.

At the time of the events in this case, many traders were using UTCs as a "purely virtual product."  Penalty Assessment Order at P 19.  But UTCs had been "initially created as a tool to hedge congestion price risk associated with physical transactions."  <u>Id.</u> at P 18.  Apparently because of that original connection to physical transactions, PJM required UTC transactions, even virtual ones, "to be associated with transmission service reservations, which, once obtained, provided the right to flow electricity across the PJM system."  <u>Id.</u> at P 22.  There was normally a charge to obtain a transmission reservation, but there was a legitimate way for UTC traders to avoid that charge.  For reasons that are not important, PJM did not require UTC traders to reserve the same transmission path (<u>i.e.</u>, source and sink) that the UTC involved, and it did not charge a fee for transmission reservations where the sink was located in a neighboring RTO's territory. This meant that, regardless of which nodes were involved in the UTC, a trader could always choose to obtain a free transmission reservation by specifying a transmission path with a sink in the neighboring RTO.  <u>Id.</u>

These free reservations, however, were not eligible to receive a "Marginal Loss Surplus Allocation" (MLSA) payment, a type of financial credit that is central to this case.  When electricity is transmitted across the grid, some energy is inevitably lost in the form of heat.  This is called "line loss."  To ensure that the market price at each node reflects the actual cost of providing energy at that location, the LMP that PJM calculates for each node incorporates a line loss component.  In 2006 FERC instructed PJM to start using a new method for setting the price

of the line loss component.  Atl. City Elec. Co. v. PJM Interconnection, LLC, 115 FERC ¶ 61,132 (2006).  This new "marginal loss method" would result in more accurate price signals, and hence a more efficient allocation of electricity-generation resources, but (for reasons not worth detailing here) it would also lead PJM to "receive[] more payments than necessary to compensate for actual line losses, resulting in a surplus revenue."  Penalty Assessment Order at P 24.  PJM therefore had to establish a method for disbursing the "marginal loss surplus" to market participants.  PJM originally proposed (and FERC agreed) that the surplus should be paid to load-serving entities (LSEs) in proportion to their share of total load, on the theory that LSEs pay for the fixed costs of the transmission grid.  Atl. City Elec. Co. v. PJM Interconnection, LLC, 117 FERC ¶ 61,169 at PP 12–13, 27–28 (2006).

In what became known as the Black Oak proceeding, a group of virtual traders challenged both the marginal loss method of setting prices and the original MLSA payment scheme.  The traders argued that because their virtual transactions did not result in actual power flows, they should not have to pay for line losses.  Alternatively, they argued that if they had to pay for line losses, they should also get MLSA payments.  In March 2008, FERC rejected their arguments, concluding that they should have to pay for line losses just like all other market participants and should not get MLSA payments because they did not contribute to the fixed costs of the grid. Black Oak Energy, LLC v. PJM Interconnection, LLC, 122 FERC ¶ 61,208 (2008).  In October 2008, however, FERC partially reconsidered its decision.  FERC adhered to its position that, in general, virtual transactions should not entitle traders to MLSA credit.  In doing so FERC repeatedly expressed concern that, otherwise, virtual traders might "conduct trades simply to receive a larger credit."  Black Oak Energy, LLC v. PJM Interconnection, LLC, 125 FERC ¶ 61,042 at P 38 n.46 (2008); see also id. at P 43.  But FERC concluded that because virtual traders

placing UTC bids <u>did</u> pay transmission costs and therefore <u>did</u> support the fixed costs of the grid, it appeared discriminatory not to give MLSA credit for those transactions specifically. <u>Id.</u> at PP 48–49. PJM accordingly revised its tariff and began paying MLSA to traders for UTC transactions that cleared the market and were associated with a paid transmission reservation. Penalty Assessment Order at P 25. By contrast, a UTC associated with a free transmission reservation (obtained by selecting a transmission sink in the neighboring RTO), was not eligible for MLSA. <u>Id.</u> at P 22.

One final and important point about MLSA: In some circumstances, the MLSA payment a trader received would exceed the cost of reserving the associated transmission (plus other transaction costs). That is, sometimes the MLSA payment could be large enough to cover the cost of placing a UTC trade, and then some. This was most likely to be true during hours of peak usage, when marginal losses, and hence MLSA payments, would be high. <u>See id.</u> at P 52.

## II. DEFENDANTS' ALLEGED CONDUCT

### A. Trading Conduct

Defendant K. Stephen Tsingas is the founder and controlling owner of defendant City Power Marketing, LLC, an energy-trading firm he started in 2005. Penalty Assessment Order at P 12. City Power's trading in the PJM marketplace focused on UTCs, with City Power seeking to identify through intensive research pairs of nodes where the price spread was likely to widen substantially between the day-ahead and real-time markets. <u>Id.</u> at P 43. But in July 2010, FERC alleges, City Power developed a new strategy—a strategy that at bottom was "a fraudulent UTC trading scheme to receive excessive amounts of MLSA payments." <u>Id.</u> at P 3. City Power's trading activity itself tells part of the story, but further detail is supplied by online instant messages (IMs) sent between Tsingas (who went by the handle "traderyoda") and a City Power partner

named Tim Jurco ("jurco831").   Jurco saved these IMs and, as will be explained later, they
eventually wound up in FERC's hands.

The story begins in late June 2010, when Tsingas observed that other virtual traders were
making unusually large transmission reservations.   FERC Enforcement Staff Report and
Recommendation, City Power Mktg, LLC & K. Stephen Tsingas, App'x A to Pl.'s Ex. 2 [ECF No.
1-4] at 13–15 ("Staff Report").   (Traders could see each other's transmission reservations but not
their pricing nodes.  Id. at 13.)   Tsingas noticed that these large reservations were during peak
hours and suggested to Jurco that the other traders were "doing cheap stuff to collect losses"—i.e.,
to get MLSA.  Id. at 15.   On July 3, while pondering the other traders' strategy, Tsingas had an
insight:

> traderyoda: wonder what points they're doing
> traderyoda: or is it the rope-a-dope
> traderyoda: that may be the trick
> traderyoda: do both sides to collect losses
> traderyoda: EUREKA
> traderyoda: those bastards

Id. at 16–17.  By "do both sides to collect losses," Tsingas was referring to "round-trip" trading:
placing one UTC trade with source A and sink B, and a simultaneous trade with source B and sink
A.  This combination of trades was guaranteed not to earn or lose money on the basis of changing
price spreads, for any profit the A-to-B trade might yield would be offset by an equal loss on the
B-to-A trade.   But, if the trader chose to pay for transmission, the transaction would generate
MLSA.  See Penalty Assessment Order at P 45.  Jurco saw the potential:

> jurco831: nice
> jurco831: load up [i.e., trade in large volumes]
> jurco831: net flat [i.e., no profit or loss from price spreads]
> jurco831: collect [i.e., get MLSA]

> jurco831: that is dirty dirty
>
> jurco831: but legal I guess

Staff Report at 17.   Later that day City Power began placing round-trip trades with paid

transmission reservations.   Sure enough, the MLSA exceeded the cost of transmission (and other

transaction costs) and so City Power got paid for its "net flat" trades.   All told, over the course of

July 2010 City Power collected $455,730 in net profit from round-trip trades.   Penalty Assessment

Order at PP 47–48.

 City Power developed a second type of "loss trade" in short order.   This one entailed

placing UTCs between two nodes named SOUTHIMP and SOUTHEXP, which were "import and

export pricing points of the same PJM interface, and which ha[d] equivalent prices in both the day-

ahead and real-time markets."   Id. at P 49.   The result of this equivalent pricing, as Tsingas

observed in a message to Jurco, was that "SOUTHIMP-SOUTHEXP settles at $0 all the time, DA

[day-ahead] and RT [real-time]."   Staff Report at 22.   Once again, then, a UTC trade would yield

no profit or loss, but could generate MLSA.   City Power traded SOUTHIMP-SOUTHEXP for

roughly a week in early July and collected $106,401 in net profit.   Penalty Assessment Order at

P 49.   Tsingas remarked on their success during this period:

> traderyoda: these losses paid well the few days we had 2,000 mw's
>
> jurco831: great
>
> traderyoda: as in 100k plus
>
> traderyoda: feels sleazy
>
> jurco831: wow

Staff Report at 25.   But Jurco became concerned about this particular trading path:

> jurco831: back to the losses thing – I feel really funny about the southimp-
>  southexp but I think you're right about the other deals

Id.   Jurco worried that the SOUTHIMP-SOUTHEXP trades "could be great ammo" for PJM's

Market Monitor, the independent entity tasked with ensuring the competitive and efficient

operation of the market.  Penalty Assessment Order at P 50; <u>see also</u> <u>Elec. Power Supply Ass'n v.</u>
<u>FERC</u>, 391 F.3d 1255, 1260 (D.C. Cir. 2004) (describing market monitors).  City Power stopped
trading this path in mid-July.  Penalty Assessment Order at P 50.

City Power's third (and final) type of loss trade involved trading between nodes
NCMPAIMP and NCMPAEXP.  Although these two nodes did not always have identical prices,
they had historically experienced only very small differences.  <u>Id.</u> at P 51.  Unlike SOUTHIMP-
SOUTHEXP, then, this path could result in spread gains or losses, but they would reliably be
minimal.  As it turned out, City Power's NCMPAIMP-NCMPAEXP trades in the second half of
July 2010 earned $100,642 through price-spread gains.  <u>Id.</u> at P 52.  Those gains, however, were
wiped out (and then some) by the transaction costs of placing the trades.  <u>Id.</u> (noting transaction
costs of approximately $532,060).  Once again, it was the MLSA payments that made these
transactions profitable: City Power's net profit after receiving MLSA was $716,227.  <u>Id.</u>

Throughout July 2010 Tsingas expressed amazement and concern about the volumes of
transmission being reserved by others that he suspected were engaged in similar trading:

> traderyoda: the amount of trans sold has gone up over 2 fold over the last few
> weeks
>
> jurco831: totally
>
> traderyoda: even 3-4 fold some days
>
> traderyoda: hard to turn down 150K for doing nothing

Staff Report at 32.  Tsingas worried that "pigs" reserving huge volumes of transmission were
"making the game more difficult," <u>id.</u> at 36, and wanted City Power to keep a lower profile.

> traderyoda: I would suggest doing it in small blocks if possible
>
> traderyoda: like 750 [MW] at a time
>
> jurco831: ok
>
> traderyoda: it looks less honerous [sic]
>
> …

> traderyoda: maybe we set a max [of] 1000 for any deal, what do you think?
>
> jurco831: yes
>
> …
>
> traderyoda: this is the stay below the radar plan

Id. at 28.

City Power was not able to stay under the radar for much longer, though.  By late July PJM and the Market Monitor had begun to examine City Power's and other firms' UTC trades.  See id. at 39; Penalty Assessment Order at P 27.  City Power ceased its loss trades at the end of July.  See Penalty Assessment Order at P 3.  All told, the firm had collected more than $2 million of MLSA from those trades, for a total profit (after transaction costs) of almost $1.3 million.  Id. at PP 52 n.128, 161.

### B.  Instant Messaging Conduct

In August 2010 PJM notified FERC's Office of Enforcement (Enforcement) about City Power's unusual trading, which PJM suggested was undertaken with the intent to manipulate the market.  Penalty Assessment Order at PP 27–30.  Enforcement began investigating and on August 18 sent City Power a document retention directive.  Id. at P 53.  The next day Jurco told Tsingas that he had been archiving his IMs:

> jurco831: did a little homework last night
>
> jurco831: looking through my IM archives
>
> jurco831: do you archive yours?
>
> traderyoda: unfortunately not
>
> traderyoda: so, are we guilty or righteous?
>
> jurco831: 6/28 – first IM discussion
>
> jurco831: you literally wrote EUREKA!
>
> jurco831: we mention losses a lot
>
> jurco831: I don't know – most of the conversation is benign
>
> jurco831: we do identify certain trades as "loss" trades

> traderyoda: the only question is how many trades had zero risk
>
> jurco831: we talk about the SE trade
>
> jurco831: saying that's one we're not comfortable with

Staff Report at 53.  Several weeks later Tsingas told Jurco he was "an idiot" for having saved his IMs and told him to stop archiving them, which Jurco did.  Id. at 54.

Despite being aware of Jurco's relevant archived IMs, Tsingas failed to reveal their existence to Enforcement on any number of occasions.  In early October 2010, for instance, Tsingas provided sworn testimony to Enforcement staff.  Asked whether he knew if City Power kept records of IMs, he replied, "I don't think we do."  Penalty Assessment Order at P 54.  Asked whether Jurco or other colleagues "have set up their accounts to where it retains instant messages," he replied, "I don't believe they do, you know, but I don't know 100 percent for a fact."  Id. Tsingas also denied having attempted, after receiving the document retention directive, "to see if they have instant messages on their system."  Id.  In December 2010 Tsingas certified on behalf of City Power that it had provided true, accurate, and complete responses to Enforcement's November 2010 data request for "all communications" relating to UTC trading—even though City Power had not provided Jurco's archived IMs.  Id. at P 55.  In November 2011 Tsingas responded to another Enforcement data request, this one specifically about IMs.  Tsingas said that City Power had "reviewed computer files to determine if instant messages had been saved or otherwise archived on company computers.  They were not."  Id. at P 56.  He also said that by November 2011 Jurco was no longer with the firm and that "prior requests to Mr. Jurco to produce any responsive instant messages did not reveal any such instant messages."  Id.  Tsingas further affirmed that "upon receipt of [Enforcement's] document preservation directive, it was determined that City Power Marketing was not in possession of any responsive instant messages, and therefore no steps were required to prevent destruction of any such messages."  Id.

City Power never revealed the existence of or turned over Jurco's IMs, but Enforcement later obtained them.  Id. at P 57.  Many of the Jurco-Tsingas conversations discuss City Power's July 2010 UTC trades.  Over the course of their conversations Tsingas said that their loss trading "feels sleazy"; described loss trading generally as a "scam," a "game," "just high volume churn," and a way to make money "for doing nothing"; and acknowledged that the Market Monitor "could've ripped into me for the SIMP-SEXP and the round trip ovec stuff."  Staff Report at 25, 32–33, 36–37, 39.  (OVEC was a node City Power used in its round-trip trades.  Id. at 20–21.)  For his part, Jurco called loss trading "dirty dirty," "great ammo" for the Market Monitor, and "free money."  Id. at 17, 25, 36.  And in a conversation with another City Power partner, Jurco said loss trading "isn't trading, it's playing the rules."  Id. at 34.

### III. PROCEDURAL HISTORY

As noted, FERC began investigating City Power's UTC trading in August 2010.  Penalty Assessment Order  at P 31.  The investigation took several years and was followed by unsuccessful settlement discussions.  Id. at P 34.  Finally, in March 2015 FERC issued an Order to Show Cause and Notice of Proposed Penalty, in which it suggested that City Power's trading had violated FERC's Anti-Manipulation Rule, 18 C.F.R. § 1c.2, and that its misstatements and omissions regarding Jurco's IMs had violated FERC's Market Behavior Rule 3, concerning truthful communications with FERC, 18 C.F.R. § 35.41(b).  City Power Mktg., LLC, 150 FERC ¶ 61,176 (2015).

The Show Cause Order also required City Power to elect within 30 days one of two procedural paths offered by the Federal Power Act (FPA), 16 U.S.C. §§ 791 et seq., for the imposition of penalties.  Id. at P 6.  Pursuant to Section 31(d)(2) of the FPA, City Power could choose to have a formal, on-the-record agency hearing in front of an administrative law judge,

whose determination could then be reviewed by a court of appeals.  See 16 U.S.C. § 823b(d)(2).

Or, pursuant to Section 31(d)(3), it could choose to let FERC "promptly assess" the proposed

penalty, and if City Power did not pay within 60 days, FERC would "institute an action in the

appropriate district court of the United States for an order affirming the assessment of the civil

penalty."  Id. § 823b(d)(3).  Under this second option, the court would have "authority to review

de novo the law and the facts involved" and "to enter a judgment enforcing, modifying, and

enforcing as so modified, or setting aside" the penalty assessed.  Id. § 823b(d)(3)(B).  City Power

chose the second option and also filed an answer to the Show Cause Order.  Penalty Assessment

Order at P 37.

On July 2, 2015, FERC issued its Penalty Assessment Order.  FERC concluded that City

Power had indeed violated the Anti-Manipulation Rule in that it had "deceived PJM into disbursing

MLSA payments by creating the false impression that City Power was trading to arbitrage price

differentials when, in fact, it was engaging in trades solely to collect MLSA payments to the

detriment of other market participants."  Id. at P 6.  FERC also found that City Power's statements

to FERC Enforcement staff regarding IMs were false or misleading, in violation of Market

Behavior Rule 3.  Id. at P 9.  FERC ordered City Power to disgorge roughly $1.2 million in unjust

profits, and also assessed a $14 million penalty against City Power, for which City Power and

Tsingas were jointly and severally liable, and a separate $1 million penalty against Tsingas.  Id. at

PP 1, 257.

City Power did not pay the penalty within 60 days, and thus on September 1, 2015, FERC

filed this action asking the Court to affirm the Penalty Assessment Order.  City Power filed a

motion to dismiss, arguing that FERC's claims under both the Anti-Manipulation Rule and Market

Behavior Rule 3 fail as a matter of law, and also raising a number of procedural issues.  See Defs.'

Mem. Supp. Mot. Dismiss [ECF No. 12] ("Defs.' Mem."); see also Pl.'s Opp'n [ECF No. 16];

Defs.' Reply [ECF No. 18].  On June 1, 2016, the Court held a hearing on the motion.  See Hr'g

Tr. [ECF No. 21].  Roughly a week after the hearing, FERC sought leave to file a supplemental

memorandum in support of its position.  The Court granted leave and also authorized City Power

to file a response, which it did.  See Pl.'s Supp. Mem. [ECF No. 24]; Defs.' Supp. Resp. [ECF No.

23].

## DISCUSSION

### I. APPLICABLE PROCEDURES

Before turning to City Power's arguments for dismissal, the Court confronts a threshold

question regarding the nature of this proceeding.  City Power argues that this is a standard civil

action, governed by the Federal Rules of Civil Procedure, in which it should be entitled to

discovery just like any other civil litigant and, if factual disputes persist, to a jury trial on the merits.

FERC, by contrast, while acknowledging the Court's discretion to determine appropriate

procedures (which might include discovery and a trial or hearing), says this is not a normal civil

action; in light of the extensive, adversarial proceedings at the agency level, and of certain statutory

language, FERC argues that the Court should start with the assumption that it need only examine

the agency record and the Penalty Assessment Order.  The Court concludes that, for the most part,

City Power has the better of this argument.  Notwithstanding the significant proceedings that

occurred at the agency level, the Court will treat this as a standard civil action, governed by the

Federal Rules of Civil Procedure.  In so deciding, the Court agrees with much of the reasoning in

FERC v. Maxim Power Corp., Civ. No. 15-30113-MGM, 2016 WL 4126378, at *4–11 (D. Mass.

July 21, 2016).

The starting point of the analysis is the FPA.  As noted earlier, FPA Section 31(d) creates two pathways by which a penalty can be imposed.  Under the default option—call it Option 1—once FERC provides notice of its proposed penalty,

> the Commission shall assess the penalty, by order, after a determination of violation has been made on the record after an opportunity for an agency hearing pursuant to [5 U.S.C. § 554] before an administrative law judge . . . .  Such assessment order shall include the administrative law judge's findings and the basis for such assessment. . . .  Any person against whom a penalty is assessed under this paragraph may . . . institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order in accordance with chapter 7 of title 5.  The court shall have jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in [p]art, the order of the Commission, or the court may remand the proceeding to the Commission for such further action as the court may direct.

16 U.S.C. § 823b(d)(2).  Option 1 thus describes a traditional form of judicial review of agency action, based on the record developed in an agency proceeding, which is familiar in administrative law.  But some alleged violators, including City Power, have the choice of instead selecting Option 2, which sets out a less familiar path:

> (A) In the case of any civil penalty with respect to which the procedures of this paragraph have been elected, the Commission shall promptly assess such penalty, by order, after the date of the receipt of the notice . . . of the proposed penalty.

> (B) If the civil penalty has not been paid within 60 calendar days . . . , the Commission shall institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty.  The court shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in [p]art such assessment.

Id. § 823b(d)(3).  City Power chose Option 2.  The question now is what procedures govern the "action in the appropriate district court."

Federal Rule of Civil Procedure 1 is the logical place to start.  It begins: "These rules govern the procedure in all civil actions and proceedings in the United States district courts, except as

stated in Rule 81."  Rule 81 contains no exception for a case of this sort.  Of course, in addition to those identified in Rule 81, Congress can specify that certain types of actions are governed by procedures other than the Federal Rules.  See N.H. Fire Ins. Co. v. Scanlon, 362 U.S. 404, 407 & n.6 (1960).  But a "clear expression" of such congressional intent is "necessary" before a court should depart from the Federal Rules.  Califano v. Yamasaki, 442 U.S. 682, 700 (1979).  There is no clear expression of such intent here.  FPA Section 31(d)(3) does not explicitly make the Federal Rules inapplicable, nor is it incompatible with their application.  See Maxim Power, 2016 WL 4126378, at *6.

FERC emphasizes the word "review" in Section 31(d)(3), which it says indicates that the district court should not engage in plenary adjudication.  But the Court does not think "review" is enough to indicate a summary proceeding.  The statute at issue in Califano provided for district court "review" of an agency decision, and the Supreme Court still held that the Federal Rules governed.  See 442 U.S. at 698–701 & n.12.  And in United States v. First City National Bank of Houston, the Supreme Court examined a statute that instructed district courts to "review de novo the issues presented."  386 U.S. 361, 368 (1967) (internal quotation marks omitted).  The Court rejected the argument

> that the use of the word "review" rather than "trial" indicates a more limited scope to judicial action.  The words "review" and "trial" might conceivably be used interchangeably.  The critical words seem to us to be "de novo" and "issues presented."  They mean to us that the court should make an independent determination of the issues.

Id.  Here, the FPA's instruction "to review de novo the law and the facts involved" likewise signals that the Court should make an independent determination of the issues.  The logical procedures to govern that determination are those set forth in the Federal Rules.

Furthermore, the Court does not see why it should place special weight on the agency record or presume that City Power should not get discovery.  Option 1 clearly envisions the

development of a comprehensive record at the agency level and record-based review by a court of appeals.  But Option 2 does not mandate any particular agency procedures, and places judicial review in a district court, where factual development through discovery is the norm.  Even FERC ultimately concedes that Option 2 does not confine the Court's analysis to the materials compiled at the agency.  See Pl.'s Opp'n at 37.  FERC nonetheless thinks that the record will prove adequate, and emphasizes that City Power was given the opportunity to submit whatever materials it wished at the agency level.  See id.  But although City Power had the opportunity submit any evidence it wished, it did not necessarily have the ability to obtain it.  Unlike FERC, City Power did not have the authority to subpoena records or depose witnesses during the agency proceedings.  Once it has that ability, City Power might be able to show that the factual landscape is meaningfully different from what FERC's Penalty Assessment Order indicates.  See Maxim Power, 2016 WL 4126378, at *10.

FERC suggests that if City Power wanted discovery, it should have chosen Option 1, the formal hearing before an administrative law judge.  See id. at 39–40; Hr'g Tr. at 71–72 ("[Defendants] gave up the guaranteed opportunity to have discovery and an evidentiary hearing.  They had that.  They turned it down.").  But the Court does not see why the fact that discovery is available under Option 1 suggests that it is not available under Option 2.  There is no reason that Option 2 must provide defendants with fewer procedural protections.  The Court thinks it more natural to assume that both Options allow defendants to fully develop their factual defenses, just in different settings.  See Maxim Power, 2016 WL 4126378, at *11.

Contrary to FERC's suggestion, interpreting Option 2 to provide for full-dress adjudication in district court does not render the agency process culminating in the Penalty Assessment Order (and the Order itself) "a pointless exercise."  Pl.'s Opp'n at 40.  There is no escaping the fact that

under Option 2 FERC must first determine at the agency level whether to assess the penalty.  If the agency proceeding is as fair and adversarial as FERC proclaims, presumably it sometimes leads FERC to decide not to assess a penalty at all (or to assess a much smaller one), obviating the need for judicial proceedings entirely.  That is hardly pointless.  Nor is it pointless to embody the assessment decision in an order, for the act of reducing a decision to writing can itself influence the decisionmaking process.  See, e.g., Arlinghaus v. Ritenour, 543 F.2d 461, 464 (2d Cir. 1976) (per curiam) ("A decisionmaker obliged to give reasons to support his decision may find they do not; 'the opinion will not write.'").  And, as has been true here, a penalty assessment order will help the district court fully grasp FERC's factual allegations and legal theories.  Thus, the value of the agency proceeding and order is not erased by the availability of discovery and de novo adjudication in the district court.[1]

In sum, the Court will treat this case like a normal civil action governed by the Federal Rules.  That does not, however, stop FERC from seeking affirmance of the Penalty Assessment Order right away.  If FERC is convinced that the agency record contains all of the relevant evidence and shows conclusively that City Power is liable, FERC can move for summary judgment promptly.  See Fed. R. Civ. P. 56(b).  But City Power will be free to argue that without discovery "it cannot present facts essential to justify its opposition," at which point the Court might defer consideration of the motion until City Power has had the opportunity to gather those facts.  See Fed. R. Civ. P. 56(d).  And the Court will apply the usual summary judgment standard in resolving any such motion.

---

[1] One of FERC's concerns is sandbagging: FERC worries that City Power might present arguments and evidence in this proceeding that it could have but failed to present to the agency in response to the Show Cause Order.  See Pl.'s Opp'n at 37–38 & n.35; Hr'g Tr. at 72.  If this occurs, FERC will be free to argue that City Power has waived those issues.  The Court will evaluate any such argument if and when FERC makes it.

The Court does reserve judgment on one issue: whether City Power is entitled to a <u>jury</u> trial.  City Power says it is; FERC says it isn't.  The Court does not see why it must resolve this dispute now.  Even in a case where the right to a jury trial is undisputed, that right only comes into play if the case makes it past the summary judgment stage.  If the plaintiff is entitled to summary judgment, the defendant's theoretical right to a jury trial is irrelevant, for there will be no trial whatsoever.  <u>See</u> <u>Calvi v. Knox Cty.</u>, 470 F.3d 422, 427 (1st Cir. 2006) ("[A] grant of summary judgment does not compromise the Seventh Amendment's jury trial right because that right exists only with respect to genuinely disputed issues of material fact."); 10A Charles Alan Wright et al., Federal Practice and Procedure § 2714 (3d ed. 1998).  This case might be resolved at summary judgment, mooting the question whether City Power is in theory entitled to a jury trial.  Because the Court might not need to answer this question at all, it will not do so now.  <u>See</u> <u>PDK Labs. Inc.</u> <u>v. DEA</u>, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (highlighting "the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more").

*          *          *

With this threshold question of procedure out of the way, the Court can turn to City Power's arguments for dismissal.  The parties agree, and so does the Court, that these arguments should be assessed under the usual standard governing Rule 12(b)(6) motions to dismiss.  Defs.' Mem. at 7–8; Pl.'s Opp'n at 3–4.  Under that standard, a court must presume the truth of a complaint's factual allegations, though it is "not bound to accept as true a legal conclusion couched as a factual allegation."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotation marks omitted).  The court then asks whether the facts alleged suffice "to state a claim to relief that is

plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In addition to the complaint itself, the court can examine documents attached to or incorporated in the complaint, and matters subject to judicial notice. See Trudeau v. FTC, 456 F.3d 178, 183 (D.C. Cir. 2006). Here, FERC attached to its complaint the 125-page Penalty Assessment Order, the Show Cause Order, and its Enforcement Staff's Report and Recommendation, which is repeatedly referenced in the Penalty Assessment Order. The Court will consider all of these materials. Insofar as these materials recount disagreements of fact between FERC and City Power, the Court will at this stage accept FERC's version as true.

## II. THE ANTI-MANIPULATION RULE

City Power seeks dismissal of FERC's claim under the Anti-Manipulation Rule on several grounds. The first and most fundamental is that FERC has failed to allege any fraudulent conduct that violates the Rule. But the Court is ultimately unpersuaded. FERC has plausibly alleged that UTC trading was allowed in the PJM market for the purpose of arbitrage, and that while City Power's transactions had the superficial appearance of arbitrage trades, they were in fact specifically designed not to serve that purpose, and instead to do nothing but rake in MLSA payments. If true, as FERC has alleged, this trading was deceptive and constituted a scheme to defraud. At this stage of the proceedings, then, the Court cannot conclude that FERC's claim under the Anti-Manipulation Rule fails as a matter of law.

Enacted as part of the Energy Policy Act of 2005 (EPAct), Pub. L. No. 109-58, 119 Stat. 594, Section 222 of the FPA provides in relevant part:

> It shall be unlawful for any entity (including an entity described in section
> 824(f) of this title), directly or indirectly, to use or employ, in connection
> with the purchase or sale of electric energy or the purchase or sale of
> transmission services subject to the jurisdiction of the Commission, any

> manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of title 15), in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers.

16 U.S.C. § 824v(a).   On the basis of this statutory authority, FERC promulgated the Anti-Manipulation Rule in January 2006.   Prohibition of Energy Market Manipulation, Order No. 670, 114 FERC ¶ 61,047, 71 Fed. Reg. 4244 (2006).   The relevant portion of the Rule states:

> It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,
>
> (1) To use or employ any device, scheme, or artifice to defraud,
>
> (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

18 C.F.R. § 1c.2(a).

In promulgating the Anti-Manipulation Rule, FERC offered an expansive definition of "fraud," deeming it "to include any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."   Order No. 670, 114 FERC ¶ 61,047 at P 50. Read for all it's worth, this definition might appear to jettison any requirement of misrepresentation or deception, contrary to the common understanding of fraud.   See, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co., 215 F.3d 182, 191 (1st Cir. 2000) ("The hallmarks of fraud are misrepresentation or deceit.").   That reading, however, would be inconsistent with Congress's command that "manipulative or deceptive device or contrivance" in FPA Section 222 means the same thing that it means in 15 U.S.C. § 78j(b), better known as Section 10(b) of the Securities Exchange Act of 1934 (SEA).   Despite the disjunctive phrasing "manipulative or deceptive," it is well-established that conduct cannot run afoul of Section 10(b) unless it involves deception.   See,

e.g., SEC v. Pirate Inv'r LLC, 580 F.3d 233, 239 (4th Cir. 2009); Foss v. Bear, Stearns & Co., 394

F.3d 540, 541 (7th Cir. 2005); see also Schreiber v. Burlington N., Inc., 472 U.S. 1, 6–8 (1985).

The same, then, is true of FPA Section 222.  And if the statute requires deception, so too must the

Anti-Manipulation Rule.  Cf. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 212–14 (1976) (noting

that the scope of SEC Rule 10b-5 cannot exceed that of SEA Section 10(b)).

That said, Section 10(b) case law indicates that the Court should not take a cramped view

of the types of deception that can give rise to fraud.  See Superintendent of Ins. v. Bankers Life &

Cas. Co., 404 U.S. 6, 12 (1971) ("Section 10(b) must be read flexibly, not technically and

restrictively.").  Importantly, deception need not take the form of "a specific oral or written

statement," for "[c]onduct itself can be deceptive."  Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,

552 U.S. 148, 158 (2008).  And the same conduct may or may not be deceptive depending on an

actor's purpose.  See Markowski v. SEC, 274 F.3d 525, 529 (D.C. Cir. 2001).  Securities

transactions that would be lawful if based on a genuine belief that the market has misvalued a

security can be unlawfully deceptive if undertaken to obtain some side benefit.  In Markowski, for

example, the D.C. Circuit held that an underwriting firm (Global) had violated SEC Rule 10b-5 by

trading with the "external purpose" of propping up the price of a security it had underwritten in

order "to maintain customer interest in Global generally and to sustain confidence in its other

securities."  Id.  And in Koch v. SEC, the D.C. Circuit affirmed that it violates Rule 10b-5 to "mark

the close": to trade at the very end of the day with the goal of driving the day's closing price up or

down, which can trigger various collateral benefits for the trader.  793 F.3d 147, 152–56 (D.C. Cir.

2015); see also 5 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 14:47 (7th

ed. 2016) (discussing marking the close).  Markowski and Koch thus reveal an important point:

under Section 10(b), securities traders are not free to trade for whatever purpose they wish.  Traders

are presumed to be trading on the basis of their best estimates of a security's underlying economic value, see, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 100–01 (2d Cir. 2007), and to trade for other purposes can be deceptive.

That brings us to the crucial premise of FERC's theory in this case—namely, that virtual traders were allowed to engage in UTC trading for a particular purpose: "to profit by arbitraging the price differences between two nodes in the day-ahead and real-time markets."  Penalty Assessment Order at P 102; see also, e.g., id. at P 115.  Perhaps at a later stage of this litigation City Power will be able to show that this premise is false, but for now FERC has at least plausibly alleged that it is true.  It is plausible, first, because the foremost reason to allow virtual energy trading is that it helps to converge day-ahead and real-time prices, which leads to a more efficient market overall.  See, e.g., ISO New England, Inc., 113 FERC ¶ 61,055 at PP 29–31, 37–38 (2005); Metin Celebi et al., Virtual Bidding: The Good, the Bad and the Ugly, Electricity Journal, June 2010, at 16, 18.  But price convergence can only occur if virtual traders try to accurately predict price differences and place trades that embody those predictions; "net flat" trades cannot spur convergence.  FERC's present view of virtual UTC trading, moreover, is consistent with what it said in the 2008 Black Oak orders.  There FERC described UTCs as "arbitrage transactions" and the virtual traders engaged in them as "arbitrageurs."  122 FERC ¶ 61,208 at P 50 & n.85.  In those same orders, FERC expressed clear disapproval of the possibility that virtual traders might seek to profit by simply maximizing MLSA instead of reacting to price differences.  Id. at P 51; 125 FERC ¶ 61,042 at PP 38 n.46, 43.  And FERC has plausibly alleged that City Power "understood the arbitrage-based purpose of UTC trading in PJM."  Penalty Assessment Order at P 181; see also id. at PP 182–86 (cataloging evidence of City Power's knowledge that loss trading was inconsistent with the purpose of UTC trading).  At this stage of the litigation, then, the Court accepts the

premise that it was understood by PJM and market participants that the purpose of virtual UTC trading was to profit through price arbitrage.

With that premise in hand, and assuming the truth of FERC's allegations, it is not hard to see the deception: City Power's loss trades were sham transactions. They did not embody predictions about how prices would change between the day-ahead and real-time markets. Far from attempting to profit from changing price spreads, City Power consciously engineered these trades so that there would be <u>no</u> (or almost no) change in the price spreads at all. As discussed earlier, City Power did this in two ways. In some instances it placed UTC trades in "round-trip" pairs—A-to-B and B-to-A—so that any profitable price movement in one trade would be offset by equal but opposite movement in the other. In other instances it selected two nodes that it knew would have identical (or nearly identical) prices, so that the price difference in both the day-ahead and real-time markets would always be zero. Both types of trades were designed so that they could not possibly serve the purpose that all players knew UTCs were intended to serve: price arbitrage. They had the outward form of UTCs but none of the economic substance. In short, they were fakes. City Power placed these fake trades so that it could reserve large volumes of paid transmission, which in turn led PJM to hand over the MLSA payments. Sham transactions, of no value to the market, in order to get real payout—as alleged, then, this was a scheme to defraud, and hence a violation of the Anti-Manipulation Rule.

City Power's primary counterargument is that it told PJM exactly what it was doing. It did so, it says, through the very act of placing its trades. City Power says that in placing its trades through PJM's online platform, it necessarily revealed to PJM all of the relevant details—the nodes, price points, and volumes. And because all the details were accurately disclosed, the

argument goes, City Power cannot be deemed to have done anything deceptive.  See Defs.' Mem. at 23–24; Defs.' Reply at 8.

But this argument takes too narrow a view of deception in this context.  At the time of these events, traders were placing hundreds of UTC bids per day through PJM's computerized trading platform.  See Monitoring Analytics, LLC, 2010 State of the Market Report for PJM, Volume 1, at 15 (Mar. 10, 2011) (noting roughly 600 UTC bids per day in this period).  PJM did not—could not—analyze the economics of each trade as it was placed; as long as the trade had the form of a UTC, the system let it through.  Given the computerized mechanics of the market and the volume of activity, City Power could place its sham trades without their being noticed.  And according to FERC's allegations, City Power knew it was doing exactly that.  That is why City Power consciously chose to trade in relatively small volumes: to "stay below the radar" and avoid drawing any attention to its trades.  Penalty Assessment Order at P 154.  Thus, even though City Power transmitted raw data that in theory would have allowed PJM to figure out that the loss trades were economic nullities, it was predictable that PJM would not in fact perceive the true nature of the transactions.  Just as attempting to purchase goods with a counterfeit bill is deceptive even if one writes a tiny "NOT REAL!" in the corner, so too were City Power's loss trades.

City Power also argues the loss trades cannot be considered sham trades because they involved real risk.  See Defs.' Supp. Resp. at 16–18.  The NCMPAIMP-NCMPAEXP trades involved real price-spread risk, says City Power, pointing to the undisputed fact that City Power made "$100,642 in spread gains" from those trades.  Id. at P 144.  And the round-trip trades had risk in that, if the price spread were big enough, one of the paired trades would fail to clear, leaving City Power exposed to price-spread risk on the remaining trade.  But these theoretical risks do not prove that the loss trades were not sham transactions.  FERC alleges that City Power chose the

NCMPAIMP-NCMPAEXP path precisely because there would be <u>some</u> price spreading, which would make the trades look like arbitrage, but the spreads would be so small that any losses would reliably be overwhelmed by the MLSA payout.   <u>See</u> <u>id.</u> at P 51.   In other words, if FERC's allegations are true, the NCMPAIMP-NCMPAEXP trades were just <u>well-disguised</u> sham trades. As for the round-trip trades, the theoretical risk was essentially no risk in practice: according to FERC, both legs of City Power's round-trip trades cleared 99% of the time.  <u>Id.</u> at P 107.   And there is no escaping the conclusion that the SOUTHIMP-SOUTHEXP trades (about which City Power has little to say) lacked substance: FERC alleges that there was no price spread at all on this path during the relevant period and that City Power <u>knew</u> there would be no spread.  <u>Id.</u> at P 127. Nothing about the loss trades, as alleged, is inconsistent with FERC's theory that they were sham transactions designed for the exclusive purpose of generating MLSA payments.

City Power also argues that the Anti-Manipulation Rule claim must fail because FERC has not adequately alleged that City Power caused any harm.  <u>See</u> Defs.' Mem. at 25–26; Defs.' Reply at 13–15.  But, for starters, why must FERC allege harm?  The SEC need not show harm when it brings an enforcement action under Rule 10b-5.  <u>Graham v. SEC</u>, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000).  Why should FERC have to do so under the Anti-Manipulation Rule?  By prohibiting "any device, scheme, or artifice to defraud" and "any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity," the Rule covers even unsuccessful schemes that harm no one.  <u>Cf.</u> <u>Markowski</u>, 274 F.3d at 529 ("Just because a manipulator loses money doesn't mean he wasn't trying.").  In any event, FERC has quite plainly alleged harm: City Power took home more than $2 million of MLSA as a result of its phony UTCs.  Penalty Assessment Order at P 161.  Even if the total amount of MLSA for PJM to distribute would have been less without City Power's activity—City Power did pay for transmission, after all—City

Power clearly extracted more than it contributed.  And that means that City Power wound up with money that would have otherwise been paid to other market participants.  That is harm.  City Power suggests that FERC needs to identify each of those other market participants by name, but there is no basis for such a requirement.  Although Federal Rule of Civil Procedure 9(b) requires fraud claims to be pleaded with particularity, in terms of harm, it is enough for a plaintiff to state "what was obtained or given up as a consequence of the fraud."  U.S. ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation marks omitted).  FERC has done so: as a consequence of the loss trades, City Power obtained more than $2 million of MLSA.

In sum, FERC's allegations—both those about the nature of UTC trading in PJM generally and those about City Power's trading in particular—suffice to state a claim under the Anti-Manipulation Rule.  At later stages of this case, of course, City Power will have the chance to argue that those allegations are unsupported by the evidence.  But at this point FERC has at least "state[d] a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (internal quotation marks omitted).

## III. FAIR NOTICE

City Power next argues that FERC's Anti-Manipulation Rule claim fails for lack of fair notice.  "Due process requires that parties receive fair notice before being deprived of property. . . . In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."  Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995).  City Power maintains that, assuming its alleged conduct is now deemed to violate the Anti-Manipulation Rule, City Power could not have known in advance that FERC would consider its trades unlawful.  It therefore cannot be penalized.  See Defs.' Mem. at 26–28; Defs.' Reply at 15–16.

The Court disagrees.  The Anti-Manipulation Rule gave clear notice that fraudulent schemes of all sorts were prohibited.  As City Power concedes, FERC did not need to identify every possible form of fraud in advance, an obviously impossible task.  <u>See</u> Hr'g Tr. at 18:1–9.  The fair notice question, then, boils down to whether City Power should have known its UTC loss trading was a fraudulent scheme.  The answer is yes.  Accepting once more the truth of FERC's allegations about the nature of UTC trading, <u>see</u> <u>supra</u> pp. 25–26, a reasonable person would have recognized that loss trades of this sort were sham transactions, and that to use them as a mechanism for collecting MLSA—to get money "for doing nothing," as Tsingas allegedly put it—would constitute a scheme to defraud.

City Power's creative attempt to bolster its fair notice argument by invoking the <u>Black Oak</u> proceeding is unpersuasive.  City Power notes that in the 2008 <u>Black Oak</u> orders FERC acknowledged that paying MLSA to virtual traders could "creat[e] an incentive for arbitrageurs to engage in purchase decisions, not because of price divergence, but simply to increase line loss payments."  125 FERC ¶ 61,042 at P 43.  According to City Power, FERC thus accurately predicted the emergence of loss trading, and yet it did not warn market participants that it considered such trading fraudulent.  In City Power's view, then, market participants lacked fair notice that they could be penalized for such trades.

This is an implausible reading of the <u>Black Oak</u> orders.  Those orders make abundantly clear FERC's view that virtual traders should be seeking to profit by accurately predicting price differences between the day-ahead and real-time markets, and that it did not want traders to have an incentive to trade with the aim of merely maximizing MLSA.  <u>See</u> 125 FERC ¶ 61,042 at PP 38 n.46, 43; 122 FERC ¶ 61,208 at P 51.  It is true that FERC's decision to let UTCs become eligible for MLSA wound up creating precisely that bad incentive, but the <u>Black Oak</u> orders did not <u>predict</u>

that outcome. FERC seems to have thought that as long as UTC traders were <u>paying</u> for transmission, there would be no harmful distortion of incentives. <u>See</u> 125 FERC ¶ 61,042 at P 43 (expressing concern about the distorting effect of the "payment of the surplus to arbitrageurs that is unrelated to the transmission costs"). FERC was wrong about that. But it is untenable to read the <u>Black Oak</u> orders as predicting UTC loss trading, much less tacitly endorsing it. There is no escaping the orders' clear message that FERC <u>did not want</u> market participants "to conduct trades simply to receive a larger [MLSA] credit." <u>Id.</u> at P 38 n.46.

To be clear, the Court's point is not that the <u>Black Oak</u> orders alone provided sufficient notice that City Power's loss trading was unlawful. The key source of notice was the Anti-Manipulation Rule itself, which made clear that all forms of fraud were prohibited. The point here is that the <u>Black Oak</u> orders cannot fairly be read to say (or even imply) that loss trading was permissible or non-fraudulent.

## IV. FERC'S JURISDICTION

City Power's final argument for dismissal of the Anti-Manipulation Rule claim is that FERC lacks jurisdiction over City Power's loss trades. City Power thinks that is so, in short, because these were <u>virtual</u> trades that did not result in the actual interstate transmission of power. <u>See</u> Defs.' Mem. at 28–32; Defs.' Reply at 17–18. But City Power's view of FERC's authority is too narrow.

FPA Section 222 gives FERC authority to prohibit the use of any fraudulent scheme "in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission." 16 U.S.C. § 824v(a). FERC's jurisdiction over "the transmission of electric energy in interstate commerce," <u>id.</u> § 824(b)(1), covers all transmission on an interconnected, multi-state grid like PJM's, <u>see</u> <u>New York v. FERC</u>, 535 U.S.

1, 16 (2002) ("[T]ransmissions on the interconnected national grids constitute transmissions in interstate commerce."). Thus, when a market participant pays to reserve a share of the transmission available on PJM's network that is a purchase of "transmission services subject to the jurisdiction of the Commission." The fact that a virtual trader might not ultimately use that reservation to flow physical power is irrelevant. All traders, virtual and real, use the same system for reserving transmission and compete for the same finite amount of transmission capacity. The entire process of transmission allocation in PJM is therefore subject to FERC's jurisdiction. And that brings City Power's scheme within FERC's authority under the Anti-Manipulation Rule. The heart of the scheme, after all, was to reserve significant amounts of paid transmission in order to collect MLSA. The scheme was thus "in connection with the purchase or sale of . . . transmission services subject to the jurisdiction of the Commission." See Penalty Assessment Order at P 202.

Because City Power's reservation of jurisdictional transmission services is an adequate basis for FERC's authority, the Court need not examine FERC's other jurisdictional arguments— though it notes in passing that those arguments seem bolstered by the Supreme Court's recent analysis of FERC's authority in FERC v. Electric Power Supply Ass'n, 136 S. Ct. 760 (2016) (holding that FERC has authority to regulate wholesale market operators' compensation of demand response commitments).

## V. INDIVIDUAL LIABILITY UNDER THE ANTI-MANIPULATION RULE

Tsingas raises an additional argument in his individual capacity. He notes that FPA Section 222 authorizes FERC to prohibit the use of deceptive devices by "any entity." A natural person, Tsingas contends, is not an "entity" and therefore cannot violate the Anti-Manipulation Rule. The Anti-Manipulation Rule claim against him as an individual should therefore be dismissed, he says. See Defs.' Mem. at 32–36; Defs.' Reply at 18–21. Although this argument is not without some

intuitive appeal, the Court is ultimately unconvinced, and instead agrees with the three other courts

to have addressed this question that the term "entity" in Section 222 can include individuals.  See

FERC v. Maxim Power Corp., Civ. No. 15-30113-MGM, 2016 WL 4126378, at *14–15 (D. Mass.

July 21, 2016); FERC v. Silkman, Civ. No. 13-13054-DPW, 2016 WL 1430009, at *20–21 (D.

Mass. Apr. 11, 2016); FERC v. Barclays Bank PLC, 105 F. Supp. 3d 1121, 1145–46 (E.D. Cal.

2015).

Tsingas is correct that the word "entity" is often used to denote something other than an

individual person.  See, e.g., Samantar v. Yousuf, 560 U.S. 305, 315 (2010) ("'entity' typically

refers to an organization, rather than an individual").  Some dictionary definitions suggest that

"entity" does not encompass an individual.  See, e.g., Black's Law Dictionary 650 (10th ed. 2014)

("An organization (such as a business or a governmental unit) that has a legal identity apart from

its members or owners.").  And in some statutes the term is used in a way that clearly does not

include individuals.  See, e.g., Am. Dental Ass'n v. Shalala, 3 F.3d 445, 446–48 (D.C. Cir. 1993).

But "entity" sometimes has a broader meaning.  Some dictionaries indicate that an

individual person is an "entity."  See, e.g., Webster's II New College Dictionary 383 (2005)

("Something that exists as a particular and discrete unit <Individuals and corporations are

equivalent entities under the law.>"); Black's Law Dictionary 1219 (10th ed. 2014) (defining

"nonpracticing entity" as a "person or company that acquires patents with no intent to use, further

develop, produce, or market the patented invention" (emphasis added)).  The D.C. Circuit has

likewise said that "entity" "may include a natural person," in addition to various types of

organizations. City of Abilene v. FCC, 164 F.3d 49, 52 (D.C. Cir. 1999).  Various statutes use the

phrase "person or other entity" (emphasis added), suggesting that an individual is one type of

"entity."   See, e.g., 8 U.S.C. § 1324b(a)(1); 42 U.S.C. § 3605(a).   And the bankruptcy code expressly includes individuals within its definition of "entity."   11 U.S.C. § 101(15), (41).

In sum, absent a statutory definition (and there is none in the FPA) the term "entity" is ambiguous on this point.   Ambiguity cuts in FERC's favor, for the Commission's interpretation of ambiguous terms in the FPA is entitled to Chevron deference.   See, e.g., Rhinelander Paper Co. v. FERC, 405 F.3d 1, 6 (D.C. Cir. 2005).   FERC made its interpretation clear in Order 670, explaining that in its view "any entity" is a broadly inclusive term that should be read to encompass "any person or form of organization, regardless of its legal status, function or activities."   114 FERC ¶ 61,047 at P 18.   That is a reasonable reading of the statute to which the Court will defer.   See Maxim Power, 2016 WL 4126378, at *15 (finding Chevron deference applicable to FERC's interpretation of "entity"); Silkman, 2016 WL 1430009, at *21 (same).

Tsingas pushes back, arguing that in this particular statute "entity" unambiguously excludes individuals.   Tsingas says that in the rest of the EPAct, "the word 'entity' is used exclusively to describe groups and organizations," and so cannot be read to include individuals here.   Defs.' Mem. at 34.   But the Court does not find such clear uniformity throughout the EPAct. It is true that some instances of "entity" seem to refer primarily to non-individuals, and there is one instance of the disjunctive phrase "individual or entity," suggesting that an individual is not an entity, see EPAct § 652, 119 Stat. at 810.   As FERC explains, however, there are a number of instances in which it is not clear that "entity" must have this narrower sense and not apparent why individuals would logically be excluded.   See Pl.'s Opp'n at 25–27.   And countering the instance of "individual or entity" is an instance of the phrase "persons or other entities," which again suggests that an individual person is a type of "entity."   See EPAct § 349(b)(2), 119 Stat. at 709.

The Court does not find the usage of "entity" throughout the EPAct so clear and consistent as to render Section 222 unambiguous on this score.

Tsingas also argues that the use of "entity" rather than "person" makes unambiguous Congress's intent that Section 222 not encompass individuals. "Person," he notes, is specifically defined in the FPA to mean "an individual or a corporation," 16 U.S.C. § 796(4), and so would have been the obvious word for Congress to choose if it wanted to include individuals. Moreover, he observes, "person" is the word Section 10(b) of the SEA uses; the switch to "entity" in Section 222 must signify something, and the obvious answer is an intent to exclude individuals. In fact, however, there was a good reason for Congress not to have used the word "person" in Section 222. Congress specifically provided that Section 222's prohibition applies to "an entity described in section 824(f) of this title." Among the entities described in 16 U.S.C. § 824(f) is "any political subdivision [or agency] of a State." But the word "person" in the FPA specifically <u>excludes</u> subdivisions and agencies of States. 16 U.S.C. § 796(3), (4), (7). As used in the FPA, then, "person" was not broad enough to capture the full range of potential manipulators that Congress wanted covered by Section 222. <u>Cf.</u> Order No. 670, 114 FERC ¶ 61,047 at P 75 (noting that, for the same reason, FERC changed the phrase "would operate as a fraud or deceit upon any <u>person</u>" in the proposed Anti-Manipulation Rule to "would operate as a fraud or deceit upon any <u>entity</u>" in the final Rule). Because "entity" was used, at least in this respect, for the sake of its <u>breadth</u>, it hardly demonstrates an unambiguous intent to exclude individuals.

Tsingas's final argument on this issue, which consists of less than a sentence in his reply brief, is that FERC's interpretation deserves no <u>Chevron</u> deference because under FPA Section 31(d)(3) Tsingas is "entitled to <u>de novo</u> review of the law and the facts." Defs.' Reply at 19. Section 31(d)(3) does indeed authorize this Court "to review de novo the law and the facts

involved," 16 U.S.C. § 823b(d)(3), but that does not eliminate <u>Chevron</u> deference.  "<u>De novo</u> proceedings presume a foundation of law," and <u>Chevron</u> deference is properly applied as part of determining that foundation.  <u>United States v. Haggar Apparel Co.</u>, 526 U.S. 380, 391 (1999). "Deference can be given to . . . regulations without impairing the authority of the court to make factual determinations, and to apply those determinations to the law, <u>de novo</u>."  <u>Id.</u>; <u>see also</u> <u>Ampe v. Johnson</u>, Civ. No. 14-717 (RDM), 2016 WL 247562, at *5 (D.D.C. Jan. 20, 2016).  Deference is appropriate here.

Because FERC reasonably interpreted "any entity" in Section 222 to include individuals, the Court will not dismiss the Anti-Manipulation Rule claim against Tsingas in his individual capacity.

## VI.  MARKET BEHAVIOR RULE 3

As discussed earlier, FERC concluded that in addition to violating the Anti-Manipulation Rule, City Power also violated the Commission's Market Behavior Rule 3.  That rule states in relevant part:

> A Seller must provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission, [or various other entities], unless Seller exercises due diligence to prevent such occurrences.

18 C.F.R. § 35.41(b).  FERC concluded that City Power (which no one disputes is a "Seller") violated this rule on various occasions during the course of FERC's investigation when—through communications made by Tsingas on behalf of the firm—it did not reveal the existence of Jurco's archived instant messages (IMs).  Penalty Assessment Order at PP 216–23.  City Power contends that this claim fails as a matter of law, arguing that all of the statements it allegedly made turn out to be true when examined closely.  <u>See</u> Defs.' Mem. at 36–39; Defs.' Reply at 21–23.  But this issue is not even close.  Assuming the truth of FERC's allegations and drawing all reasonable

inferences in its favor, City Power (through Tsingas) made misleading statements or omitted material information on a number of occasions. FERC has therefore stated a viable claim under Market Behavior Rule 3.

Recall that on August 19, 2010, the day after City Power received a document retention directive from FERC, Tsingas and Jurco had an IM conversation in which Jurco revealed that he had archived IM conversations in which the men discussed the UTC trading under investigation. See supra pp. 12–13. Less than two months later, on October 8, 2010, Tsingas provided sworn testimony to FERC Enforcement staff. That testimony included the following exchange:

> Q [Enforcement staff]: Do you use instant messaging?
>
> A [Tsingas]: Yeah, there may have been instant messaging.
>
> Q: What instant messaging programs do you use at work?
>
> A: Just IM, AIM, whatever that thing is.
>
> Q: Do you know if City Power keeps records of those IMs?
>
> A: I don't think we do.

Staff Report at 56. Given that Tsingas was well aware that Jurco, a City Power partner, had in fact kept records of those IMs, this response appears false or misleading. City Power now argues that this was a question about City Power's records-retention policy, and so Tsingas's answer was accurate. That is a possibility the finder of fact should perhaps consider, but even so, one could still conclude that Tsingas omitted the plainly material fact that, whatever City Power's policies, Jurco did in fact have copies of relevant IMs.

During the same October 2010 testimony, this exchange also occurred:

> Q: Do you know if Mr. Jurco or your other colleagues have set up their accounts to where it retains instant messages?
>
> A: I don't believe they do, you know, but I don't know 100 percent for a fact.
>
> Q: You haven't checked with them to find out?
>
> A: I don't remember if I checked or not. My understanding is they don't, but I can't remember how I remember that.

> Q: After receiving Staff's documentation preservation letter, did you make
> any attempt to see if they have instant messages on their system?
>
> A: No.  But I did share that with the partners, at least, that this was out there.

Id.  But according to FERC's allegations, Tsingas did know that Jurco had set up his account to retain IMs, and Tsingas had confirmed, after receiving the preservation letter, that Jurco had the messages on his computer.  City Power's excuse for this exchange is even flimsier: it says Tsingas was expressing his genuine uncertainty about how his colleagues' accounts were configured at the moment of his testimony.  See Defs.' Mem. at 38.  But even if that were so, the factfinder could still easily conclude that his answers were misleading or, at minimum, again omitted the obviously material fact that Jurco had archived the IMs.

For similar reasons, if FERC's allegations are correct, City Power's December 2010 and November 2011 responses to data requests by Enforcement staff were false, misleading, or omitted material information.  Both data requests sought all communications, including IMs, regarding City Power's UTC transactions.  The second request focused on the issue of IMs in detail.  See Staff Report at 59–60.  Yet neither of City Power's responses acknowledged the existence of the IMs.  Among other questionable statements in the November 2011 response was this: "Mr. Jurco is no longer with City Power Marketing, but prior requests to Mr. Jurco to produce any responsive instant messages did not reveal any such instant messages."  Id. at 63.  A factfinder could readily conclude that saying this without also saying that Jurco had archived relevant IMs was misleading, or was at least a material omission.

In contending that this claim fails, City Power seems to think that as long as its statements were not technically false, it did not violate Market Behavior Rule 3.  See, e.g., Defs.' Mem. at 37 ("FERC has not actually, specifically, alleged that these statements were false (nor can it because all of City Power's statements were literally true).").  Indeed, City Power repeatedly describes this

claim as the "false statements claim."   See, e.g., id. at 3, 39; Defs.' Reply at 21, 23.   But Market Behavior Rule 3 is not limited to false statements; it forbids a Seller to "submit false or misleading information, or omit material information."   Assuming the truth of FERC's allegations, one could reasonably conclude that City Power's answers, even if not false, were misleading or omitted material information.   City Power will get the chance to dispute FERC's portrayal of the facts in due course, but for now the claim under Market Behavior Rule 3 survives.

### VII.  JOINT AND SEVERAL LIABILITY

Raising one final argument in his individual capacity, Tsingas contends that, contrary to the Penalty Assessment Order's conclusion, he cannot be held jointly and severally liable for any penalty imposed on City Power.   See Defs.' Mem. at 39–44; Defs.' Reply at 23–25.   No surprise, FERC thinks he can.   Pl.'s Opp'n at 29–32; see also Penalty Assessment Order at P 257.   But the Court will not resolve this disagreement here.   Even if Tsingas were correct, that conclusion would not compel the dismissal of any of FERC's claims.   It would only impact the remedy the Court would order if it ultimately finds that City Power is liable—which of course it might not find.   Like the question of City Power's right to a jury trial, then, this is a bridge the Court might never need to cross.   Judicial restraint therefore counsels against crossing it now.

### CONCLUSION

For the foregoing reasons, City Power's motion to dismiss is denied.   A separate order will issue.   Unless the parties propose a different course, the Court expects City Power to file an answer in accordance with Federal Rule of Civil Procedure 12.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  August 10, 2016